**JEHOVAH'S WITNESSES IN the STATE OF WASHINGTON et al., Plaintiffs,**

v.

**KING COUNTY HOSPITAL UNIT NO. 1 (HARBORVIEW) et al., Defendants.**

**Civ. No. 6595.**

United States District Court
W. D. Washington, N. D.

June 8, 1967.

Addendum to Memorandum Decision of June 8, 1967, and Opinion on the Merits Nov. 20, 1967.

Kenneth A. MacDonald, Frederic C. Tausend, Seattle, Wash., W. Glen How, Q. C., Toronto, Canada, Daniel Brink, Seattle, Wash., for plaintiffs.

John J. O'Connell, State Atty. Gen., James B. Wilson, Asst. Atty. Gen., Seattle, Wash., Robert E. Schillberg, Snohomish County Pros. Atty., Donald E. Priest, Deputy Snohomish County Pros. Atty., Everett, Wash., Charles O. Carroll, King County Pros. Atty., John M. Watson, James E. Kennedy, Deputy Pros. Attys. for King County, Seattle, Wash., Anderson & Hunter, Everett, Wash., Little & Jones, Charles T. Sharp, Clarkston, Wash., Williams, Lanza, Kastner & Gibbs, Holman, Marion, Perkins, Coie & Stone, Seattle, Wash., for defendants.

## MEMORANDUM DECISION

Before HAMLEY, Circuit Judge, and LINDBERG and BEEKS, District Judges.

### PER CURIAM.

The Jehovah's Witnesses, a minority religious group; the Watch Tower Bible and Tract Society of Pennsylvania, legal governing agency for the Jehovah's Witnesses; and individually-named Jehovah's Witnesses, including minors as well as adults; have brought the above-entitled action on their own behalf and as a class action on behalf of all Jehovah's Witnesses in the State of Washington. The prayer of the complaint asks that a special three-judge district court be convened pursuant to 28 U.S.C. §§ 2281 and 2284 for the purposes of declaring the legal rights of the plaintiffs and permanently enjoining all defendants, individually and as a class, from administering blood transfusions to plaintiffs in the future, as defendants allegedly have done in the past, in violation of certain constitutional rights of the plaintiffs.

The parties defendant are individually-named Superior Court judges, Juvenile Court employees, hospitals and hospital personnel, and physicians; also physicians named as representatives of a class which includes all medical doctors in the State of Washington who are employed in and paid by public institutions operating directly with funds raised entirely or in part from the taxpayers of the State of Washington, or operating under funds granted to said hospitals by the United States government; physicians named as representatives of a class that includes all medical doctors licensed to practice medicine or surgery in the State of Washington; hospitals named as representatives of a class which includes all hospitals in the State of Washington operated by the state, a county, or by any public hospital district; and hospitals named as representatives of a class which includes all licensed hospitals in the State of Washington excepting the type of "public" hospitals immediately referred to.

The state statute challenged as unconstitutional and giving rise to the request for the special three-judge court is the Juvenile Court Act of the State of Washington, R.C.W. 13.04, and more particularly sections 13.04.010(12) and 13.04.095 of said act. Plaintiffs contend that these particular sections of the act on their face and as applied to the plaintiffs are unconstitutional and invalid. The gist of the plaintiffs' complaint is that the defendant Superior Court judges pursuant to their authority under the Juvenile Court Act and upon petitions by the defendant doctors or hospital personnel have taken the children of plaintiffs and removed them from the protection of their parents by having such children declared wards of the court simply because plaintiffs in the exercise of their judgment disagree with the opinions of the defendant physicians and decline to accept blood transfusions for their children.

All defendants have filed and argued motions to dismiss. At the hearing on said motions the court *sua sponte* raised the question of its jurisdiction to hear the case at bar, referred to the decision of

the Supreme Court in Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L. Ed. 800 (1941), and requested briefs on the jurisdictional issue. After consideration of the briefs the court has concluded to reserve until a hearing on the merits its ruling on the jurisdictional issue as well as other issues raised by the motions to dismiss the Superior Court judges, the physicians, hospitals, and hospital personnel as to the eight cases set forth in the pretrial order No. 1[1] and the two cases in the supplemental complaint[2] wherein court orders were obtained pursuant to R.C.W. 13.04.010(12), declaring the children of Jehovah's Witnesses wards of the court and permitting blood transfusions to be given to such children.

Before the court for further decision at this time are the motions to dismiss the suit as to the remaining defendants, contentions and issues. The initial issue with respect to these motions is the jurisdiction of a three-judge district court to hear and decide issues related to but in no way directly bearing upon the action challenging on constitutional grounds the application of a state statute.

In pretrial order No. 1 and in the affidavit of Kenneth MacDonald filed for consideration with motion to dismiss for lack of jurisdiction (document 87) plaintiffs delineate four cases[3] wherein the constitutional rights of adult Jehovah's Witnesses are alleged to have been violated, but the contested action was not taken pursuant to the constitutionally-challenged state statute. In the supplemental complaint plaintiffs depict another situation[4] involving an adult Jehovah's Witness for whom a guardian was appointed to consent to a blood transfusion which the patient had refused on religious grounds. This alleged violation of constitutional rights likewise did not occur from an act based on the challenged state statute. These additional acts plaintiffs claim are actionable constitutional violations under the Civil Rights Act, 42 U.S. C. § 1983. The question is whether the three-judge district court may properly

1. Retained in the action until a hearing on the merits are the following parties:
 Plaintiffs: Norman C. and Carolyn Maydole and Russell Scott Maydole; and
 Defendants: Franklin Kells, M.D.; Donald B. Fager, M.D.; Judge Lawrence Leahy.
 Plaintiffs: Laurin and Geraldine Seelye and Bradley Scott Seelye; and
 Defendants: Robert F. Miller, M.D.; Judge William G. Long.
 Plaintiffs: Clifford and Joyce Burnitt and Thomas Allen Burnitt; and
 Defendants: University of Washington Hospital; Loren Winterschied; Judge William G. Long.
 Plaintiffs: Arian W. and Beatrice Elam and Jeffrey Ward Elam; and
 Defendants: Stevens Memorial Hospital, Edmonds, Washington; Donald E. Brown, M.D.; Allen Sola, M.D.; Judge Phillip Sheridan.
 Plaintiffs: James and Helen Lawrence and Heidi Jo Lawrence; and
 Defendants: University of Washington Hospital; Lloyd Nyhus, M.D.; Carl B. Erickson; Judge Theodore S. Turner.
 Plaintiffs: Jack and Hazel Pen and Michael Pen; and
 Defendants: Robert A. Aldrich; Warren Guntheroth; John Allen; Judge William G. Long.

Plaintiffs: Olite and Azell Smith and Jeanetter Smith; and
 Defendants: King County Hospital Unit No. 1 (Harborview); Robert F. Miller, M.D.; Judge Robert F. Utter.
 Plaintiffs: Richard and Bernice Brockman and Sharilyn Brockman; and
 Defendants: J. D. Klein, M.D.; Judge Thomas G. Jordan.

2. Also retained are the following parties:
 Plaintiffs: Neil and Patsy Nichol and Geri Lynn Nichol; and
 Defendants: Lester Sauvage, M.D.; Jack Docter, M.D.; Children's Orthopedic Hospital and Medical Center; Judge Robert F. Utter.
 Plaintiffs: Gene and Donna Hardy and Loren Hardy; and
 Defendants: Quay Cutshall, M.D.; Children's Orthopedic Hospital and Medical Center; Judge Walter T. McGovern.

3. The cases involve plaintiffs, Eugene and Jean Alicki; plaintiffs, Joseph G. and Shirley L. Chabot; plaintiffs, Richard D. and Doris Jean Russell; plaintiff, Evonne Sayers.

4. The case involves plaintiff, Martha Ridge.

hear questions based on violation of the Civil Rights Act.

 The three-judge district court is a statutory creature with a limited sphere of operation. It is an extraordinary court and technical requirements relating to its jurisdiction are to be strictly construed. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Gate Film Club v. Pesce, 236 F.Supp. 828 (S.D.N.Y.1964). Section 2281 of title 28 of the United States Code sets out the jurisdictional limitations binding on a three-judge court: 1) an interlocutory or permanent injunction must be sought; 2) the injunction sought must be one to restrain the action of a state officer or administrative agency; 3) the action sought to be enjoined must consist of the enforcement or execution of a state statute; 4) the injunction must be sought on the ground that the state statute is unconstitutional. Moreover, generally a disputed substantial federal question must be presented. See Bartlett & Co., Grain v. State Corp. Comm. of Kansas, 223 F.Supp. 975 (Kan.1963). The statutory requirements for three-judge court jurisdiction are requirements of substance, not of form. See Wilentz v. Sovereign Camp, 306 U.S. 573, 59 S.Ct. 709, 83 L.Ed. 994 (1939).[5] Thus, it is specifically stated that the questionable action must be taken in the enforcement or execution of a state statute; the acts of the state which are attacked must be based on the constitutionally-challenged statute.

 The policy behind the convening of a three-judge court is that a single judge ought not to be empowered to invalidate a state statute under a federal claim. It is significant that in Swift &
Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), although in another context, the Supreme Court has recently emphasized the restrictive interpretation to be given to section 2281 cases, overruling the court's more liberal holding in Kesler v. Dept. of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962) as to the cases encompassed by the three-judge procedure. In *Wickham* the court notes that "Section 2281 was designed to provide a more responsible forum for the litigation of suits which, if successful, *would render void state statutes* embodying important state policies." (382 U.S. 111, 119, 86 S.Ct. 258, 263, *emphasis added*). Such policy and the limitations of section 2281 must be considered in appraising the additional issues plaintiffs request the three-judge court to determine.

 The issue of whether or not conduct of judges, physicians, hospitals, and hospital personnel is actionable under the Civil Rights Act is not germane in determining the jurisdiction of a three-judge court. The fact that a single district court judge would have jurisdiction to hear questions arising under the Civil Rights Act is not determinative of the jurisdiction of a three-judge district court. The claim that constitutional rights have been violated by state action not based upon or taken pursuant to a specific statute is not, under the wording or a reasonable interpretation of the federal statute, sufficient to vest a three-judge court with the authority to consider the claim. As stated previously, the issues properly posed for determination by a three-judge court arise from the enforcement or execution of a state statute, which is claimed to violate constitutional rights. The questions involving the

5. The Supreme Court in *Wilentz* was applying the predecessor to section 2281; the court was asked to decide whether the suit brought met the statutory prerequisites—that is, was it a suit for an injunction "restraining the enforcement, operation, or execution of any statute of a State by restraining the action of any officer of such State in the enforcement or execution of such statute, or in the enforcement or execution of an order made by an administrative board or commission"? (306 U.S. at 579, 59 S.Ct. at 713.) In deciding that the case before it was not the kind of case encompassed by the statute, the court noted that the statute sharply and specifically defined the class of cases for the extraordinary three-judge procedure and jurisdiction could not be extended to include cases not satisfying the stated limitations.

adult Jehovah's Witnesses were not and are not predicated on R.C.W. 13.04, or on any other constitutionally-challenged state statute. Nor is it answer enough to say that because a three-judge court is considering constitutional questions arising from actions taken pursuant to the enforcement or execution of a challenged state statute, such court has "pendant" jurisdiction to hear closely-related matters. This court does not intend to depart from the traditional, limited construction of three-judge court jurisdiction. The court as a specially convened three-judge court finds no authority to extend its jurisdiction to questions involving the constitutional rights of Jehovah's Witnesses when the alleged constitutional deprivations did not occur from acts taken pursuant to a challenged state statute.

The court therefore dismisses those aspects of the case not based on acts taken in the enforcement or execution of R.C.W. 13.04.010(12) or 13.04.095.

Orders of dismissal in accordance herewith to be submitted by counsel for the various defendants.

1. In *Phillips*, the Grand River Dam Authority, a state agency, was empowered to construct the Grand River Dam and to borrow money and accept grants from the United States for such purposes. Construction of the project was begun, using money borrowed and grants accepted from the United States. During the construction, state roads were flooded and attempts by the Governor to recover from the state agency on claims resulting from the flooding of the roads were unsuccessful. The Governor later declared martial law in an area surrounding a part of the damsite and ordered the State Adjutant General to occupy it. Acting in conjunction with other state officials the Governor then obtained in a state court an ex parte order restraining further work on the dam by the Grand River Dam Authority. At this point the United States commenced an action in the federal district court to enjoin the Governor and other state officials from interfering with the Grand River Dam construction project. A three-judge district court was convened and an injunction in favor of the United States was issued by the special court. On appeal, the supreme court, Mr. Jus-

## ADDENDUM TO MEMORANDUM DECISION OF JUNE 8, 1967

### PER CURIAM.

On June 8, 1967 this court entered its memorandum decision directing dismissal of those aspects of the case which involved only actual or threatened blood transfusion of adults, and reserving until trial of the cause the court's ruling on (1) the jurisdictional issue raised by Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941), and (2) motions raised by various defendants for dismissal of the action as to some or all of them. Subsequently plaintiffs filed a motion to reconsider the court's memorandum decision insofar as it dismissed from the case the adult blood transfusion instances involving plaintiffs, Evonne Sayers and Martha Ridge.

First, as to the jurisdictional issue. Troubled by the effect of the holding of the supreme court in *Phillips*,[1] and cognizant of the technical construction given to three-judge court statutes [2] this

tice Frankfurter speaking, held that this was not the proper case for convening a three-judge court because the jurisdictional prerequisites had not been met.

2. See Memorandum Decision of June 8, 1967, pages 491–494. In Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) the supreme court upheld the power of a federal trial judge to enjoin the Minnesota attorney general from enforcing a railroad rate statute found to violate due process. The effect of the decision was to bring acts of state officers within the scope of federal judicial review and to subject the states to the restrictions of the federal constitution in situations where they might otherwise ignore it. See Wright, Handbook of the Law of Federal Courts (1963), page 160. The doctrine led to the nullification of state legislative attempts to cope with the increasing needs of a burgeoning industrial society when a single federal judge would issue an injunction invalidating a particular state regulatory statute. Limitations on federal jurisdiction in such circumstances were essential to preserve the proper al-

court *sua sponte* raised the question as to whether the instant case was properly a special three-judge case. Briefs were requested and submitted on the issue. With regard to the latter question, the court finds the present case distinguishable from the *Phillips* case and concludes that this is properly a three-judge court case.

There are two patent distinctions between the *Phillips* case and the one now before us. In *Phillips* the supreme court stated that it was "significant" that plaintiff did not, in its pleadings, specifically attack the constitutionality of the Oklahoma state constitutional provisions and statutes granting the Governor power to call out the National Guard. (See 312 U.S. at 252, 61 S.Ct. 480). In our case the pleadings expressly challenge the constitutionality of the state statutes. In *Phillips* the supreme court characterized that suit as "involving a single, unique exercise" of the powers of the Governor's office. (See 312 U.S. at 253, 61 S.Ct. 480.) In our case plaintiffs complain of ten or more such acts, extending over a considerable period of time and involving three or more counties.

There is no question but that plaintiffs are purporting to attack statutes of the State of Washington, namely two provisions of the state's Juvenile Court Law, on federal constitutional grounds. The provisions in question, namely RCW 13.-04.010(12) and RCW 13.04.095, are of statewide application.

These statutes are also mandatory in form. RCW 13.04.010(12) provides, among other things, that for the purpose of the act the words " 'dependent child' *shall* mean any child under the age of eighteen years: * * * (12) [w]ho is grossly and wilfully neglected as to medi-cal care necessary for his well-being." (Emphasis supplied) This does not appear to leave any room for an exception in the case of a child who is in fact found to be so neglected, but for religious reasons. RCW 13.04.095 provides that when any child shall be found to be delinquent or dependent, within the meaning of this chapter, the court "shall" make such order for the care, custody, or commitment of the child "as the child's welfare in the interest of the state require."

It is true that this statute does not expressly require a court to order a medically-neglected child made a ward of the court so that a blood transfusion may be administered. But where the finding of gross and wilful medical neglect is premised upon a finding that a transfusion is necessary to save life there is probably no order other than to require such a transfusion which would discharge the state judge's mandatory duty, under RCW 13.04.095, to "make such order for the care, custody, or commitment of the child as the child's welfare in the interest of the state require."

In more recent litigation courts have held that a three-judge court is required not only where a state statute is challenged as federally unconstitutional on its face, but also "as applied." Thus, in Idlewild Bon Voyage Liquor Corp. v. Rohan, 289 F.2d 426 (2 Cir. 1961) it was held at page 428 that the district judge should have convened a three-judge court where the complaint challenged the federal constitutionality of a state statute "because of the way that statute was being applied." And when the same case came before the supreme court sub nom. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962) that court stated: "We agree with the Court of Ap-

---

location of power between the United States and the several states, which is at the heart of a federal system. Exhaustion of state remedies before challenging the state action in a federal forum was one limitation. The creation of the three-judge court procedure to handle constitutional attacks on state statutes was another. It was the belief in Con-gress that there would be less public resentment where the enforcement or operation of the state statute attacked on federal constitutional grounds was stayed by a court of three judges, at least one of whom was a circuit court judge, and the decision of such court was directly appealable to the supreme court.

peals that a three-judge court should have been convened in this case." [3]

█ In essence, plaintiffs' complaint here is the same: state judges are applying a statewide statute in a federally unconstitutional manner. In view of this, and without regard to the merits of their position,[4] we think plaintiffs should not be denied a three-judge court under the *Phillips* doctrine.

Second, as to the plaintiffs' motion to reconsider the court's memorandum decision insofar as it directs the dismissal from the case of those defendants charged in relation to the blood transfusions authorized to be administered to adult plaintiffs, Evonne Sayers and Martha Ridge. With respect to these plaintiffs [5] but not in the other adult cases, court orders were obtained authorizing compulsory blood transfusions, contrary to the religious beliefs of the adults. In its decision of June 8, 1967 this court considered and rejected the proposition that it had "pendent" jurisdiction under the three-judge court procedure to determine the questions raised in the adult cases.[6]

3. See also, Kesler v. Dept. of Public Safety, 369 U.S. 153, 157, 82 S.Ct. 807, 7 L.Ed.2d 641, overruled on other grounds in Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Query v. United States, 316 U.S. 486, 489, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942); Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 84 L.Ed. 1249 (1940); "The Three-Judge District Court in Constitutional Litigation," David P. Currie, 32 Univ. of Chicago Law Review, 1, 43. But see Maison v. Confederated Tribes, etc. (9 Cir. 1963) 314 F.2d 169, 170, footnote 1.

4. With respect to the merits of the case, see the court's opinion filed herewith.

5. Both Evonne Sayers and Martha Ridge were suffering from vaginal bleeding. Each had refused blood transfusions and had in fact signed a written document releasing the hospital and doctor from any liability for any injury to her arising from a failure to give her a blood transfusion. Each woman is the mother of five children. In the Ridge instance the court appointed a guardian on the petition of the hospital without giving any notice to her of the proceeding involving her. In fact, Mrs. Ridge first heard of the matter on a radio news broadcast the day after the order had been entered. The court appointed a guardian over Mrs. Sayers on the petition of the patient's mother despite the patient's refusal and the refusal of her husband to consent to the blood transfusions. In each case the consent was given by the guardian. In the Ridge instance no transfusion was actually given. In the Sayers instance, a blood transfusion was given.

In the Ridge case, the court noted:

"The interest of the state in preserving the life of the mother for the benefit of the minor children of the ward outweighs the constitutional prohibition against interfering with the free exercise of her religious beliefs." (Pretrial order No. 2, page 29b).

In the Sayers case the court noted:

"The Constitutional right to the free practice of religion is not absolute but must be balanced against other rights, such as the right of children of tender years to have a good and loving parent. * * * The medical control of one's body is not absolute but relative when there are minor children dependent upon the survival of the adult." (Pretrial order No. 2, pages 32 and 33).

6. In support of their motion for reconsideration of the two adult cases, plaintiffs cite Louisville and Nashville Railroad v. Garrett, 231 U.S. 298, 34 S.Ct. 48, 58 L.Ed. 229 (1913); Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 275 (1932); and Florida Lime and Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960). While these cases upon casual examination appear to support plaintiffs' contention of pendent jurisdiction of this court to consider the adult cases of Sayers and Ridge, a careful consideration of the cases (including the district court opinion in Constantin v. Smith, D.C., 57 F.2d 227) indicates that the supreme court in using language such as:

"The jurisdiction of the District Court so constituted (three-judge district court) * * * extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decision of such of the questions as in its opinion effectively dispose of the case." (Sterling v. Constantin, supra, 287 U.S. pages 393–394, 53 S.Ct. page 193). was not referring to issues or claims that did not arise directly or indirectly because of action taken by virtue of the state statute under attack. In other

Because this court regards the three-judge court statute as a limitation on federal jurisdiction, and to be strictly construed, the court must, for the reasons propounded in its earlier decision as well as that stated in footnote 6 herein, deny the plaintiffs' motion to reconsider.

■ Assuming, however, that this court does have pendent jurisdiction to consider the merits of the constitutional issues raised by the compulsory transfusion of adults, the court, in the discretionary exercise of its equity powers, ought not to accord declaratory relief for the future predicated on two isolated instances. Only one county (King County), and only one superior court judge (Judge Robert F. Utter) were involved in the incidents involving plaintiffs, Evonne Sayers and Martha Ridge, both of which occurred in 1966. Even assuming that the two described instances involved violations of the constitution, and that an equitable remedy is otherwise available from this three-judge court, plaintiffs have not made a sufficient showing as to the probability that incidents of this kind will reoccur.[7]

■ Third, as to the motions raised by various defendants for dismissal of the action as to some or all of them.[8] Defendants, Donald E. Brown and Alan Sola, have moved for dismissal of the

words, as indicated by the court in the *Florida Lime* case, 362 U.S. pages 80 and 84, 80 S.Ct. 568, a three-judge district court has jurisdiction over all claims —state or federal—raised against the *statute*, but no jurisdiction over related matters not in some way challenging the statute.

While the Sayers and Ridge cases involve Jehovah's Witnesses against whom court orders were entered authorizing blood transfusions over their objections on religious grounds, neither the court orders nor any other action of the defendants were related to or involved the Juvenile Court Law here under attack. Because this court so construes its authority under section 2281, it must for the reasons stated in its June 8, 1967 Memorandum Decision, pages 3 to 6, deny the plaintiffs' motion to reconsider the court's dismissal of plaintiffs, Evonne Sayers and Martha Ridge.

action as to them on the ground that subject matter jurisdiction is lacking as to them. The only transfusion incident in which these two defendants are involved pertains to Jeffrey Ward Elam, minor son of plaintiffs Adrian and Patricia Elam.

This boy was injured in an automobile accident and defendant doctors Brown and Sola at first declined to begin necessary surgical procedures. They did so because the parents refused on religious grounds to permit a blood transfusion if, in the course of the operation, the doctors decided that this was necessary. However, Judge Phillip Sheridan, a defendant herein, entered an order finding the child a dependent child and authorized a transfusion if Doctors Brown and Sola thought it necessary. The record does not indicate who petitioned the court for such an order. An operation was then performed and the child recovered without the necessity of a transfusion.

Doctors Brown and Sola argue that, under these circumstances they were not acting under color of state law—an essential element under 42 U.S.C. § 1983— and that in any event there was no deprivation of a constitutional right because no transfusion was actually given.

While the parents had consented to an operation it was performed only when the doctors had an order from a state

Furthermore, the court having decided on the merits that plaintiffs are entitled to no relief under their principal action attacking the state statute, there would be no occasion to exercise pendent jurisdiction with respect to plaintiffs' adult cases.

7. In this connection, see the court's Opinion filed herewith, dated November 20, 1967.

8. The unopposed motions of defendants, Bert DeGroot, M.D., Robert Olson, M.D., and John P. Mucklestone, that the action be dismissed as to them were granted before the trial commenced. During the trial the court granted the motion to dismiss defendants, Everett General Hospital, Alfred Muller and James P. Hunter on the ground that the court had no jurisdiction over said parties.

court authorizing a transfusion if the doctors thought it necessary. In our view the doctors were, in these circumstances, acting under color of state law when they performed the operation. While no transfusion was given, the court order was entered and the doctors proceeded with the operation under authority of that order, contrary to the religious objections of the parents.

 This was enough to meet the jurisdictional requirement of a claimed deprivation of a constitutional right, whether or not a transfusion was actually given. It should also be noted that Doctors Brown and Sola must remain as defendants for the independent reason that they, among others, are named as representatives of a class of medical doctors. (Pretrial Order No. 2, page 35)

The motion of defendants Brown and Sola for dismissal of the action as to them, because of lack of jurisdiction, is denied.

 Pursuant to the June 8, 1967 memorandum decision, plaintiffs have made no mention in pretrial order No. 2 (which order contains the admitted and disputed facts as to each instance relied upon by plaintiffs) of the instance of adult transfusion involving plaintiffs Eugene and Jean Alicki and of defendants St. Frances Xavier Cabrini Hospital and Carter Swanson, M.D., who were concerned only with the Alicki incident and, in the case of the hospital, another dismissed incident involving an adult. Similarly, plaintiffs have made no mention in pretrial order No. 2 of the instance of adult transfusion involving plaintiffs Joseph G. and Shirley L. Chabot and defendant John Caputo, M.D., who were concerned only with the Chabot

instance. It follows that the action should be dismissed as to the defendants St. Frances Xavier Cabrini Hospital, Carter Swanson, M.D., and John Caputo, M.D., and it is so ordered.

The action may also be regarded as abandoned, and is therefore ordered dismissed as to a number of persons named in the complaint or supplemental complaint as defendants, but as to whom no grievance is stated in pretrial order No. 2. Falling in this category are F. W. Fells, Business Manager of Firlands Sanatorium; Swedish Hospital; Doctor's Hospital; Group Health Hospital; Everett Clinic, Inc.; Walla Walla General Hospital; Edwin Brockenbrough, M.D.; Jerry De Groot, M.D.; Richard Haugen, M.D.; Fred J. Jarvis, M.D.; Alfred Magar, M.D.; H. F. Newman, M.D.; Thomas W. Skalley, M.D.; Franklin Smith, M.D.; Edward Powers, M.D.; Quay Cutshall, M.D.; and George Postill.

The other motions denominated motions for dismissal on the ground of lack of jurisdiction are, in actuality, motions to dismiss for failure to state a claim upon which relief can be granted. We deal with the questions raised by these motions as a part of our consideration of the case on its merits.

### OPINION ON THE MERITS

LINDBERG, District Judge:

The principal plaintiffs herein are individual Jehovah's Witnesses whose minor children, contrary to the expressed beliefs and directions of their parents, were given blood transfusions under court orders obtained pursuant to provisions of the Juvenile Court Law of the State of Washington, namely RCW 13.-04.010(12) and 13.04.095.[1] Under this

I. RCW 13.04.010(12) of the Juvenile Court Law of the State of Washington provides:

"*Juvenile court law—Dependent and delinquent children defined— Wards of state.* This chapter shall be known as the 'Juvenile Court Law' and shall apply to all minor children

under the age of eighteen years who are delinquent or dependent; and to any person or persons who are responsible for or contribute to, the delinquency or dependency of such children.

"For the purpose of this chapter the words 'dependent child' shall mean

statutory authority, superior court judges of the State of Washington, on such showing as they deemed sufficient, declared the minor children of Jehovah's Witnesses, included herein as plaintiffs, to be dependent children for the purpose of authorizing blood transfusions of the children against the expressed objections of the parents.

The proceeding was brought by plaintiffs, individually as adults,[2] as parents and minors, and as a class action on behalf of the eighty-nine hundred Jehovah's Witnesses in the State of Washington to challenge the constitutionality of the described application of the Juvenile Court Law to plaintiffs. Also joined as parties plaintiff are The Jehovah's Witnesses, an unincorporated religious association, and the Watch Tower Bible and Tract Society of Pennsylvania, a nonprofit corporation chartered by the State of Pennsylvania and the legal governing agency of the Jehovah's Witnesses.

The defendants are the Attorney General and other officials of the State of Washington, individual physicians, superior court judges and officials of the superior court, and trustees, administrators and members of the staffs of hospitals in the State of Washington. Some of the defendant physicians were sued not only as individuals but also as representatives of a class which includes "all medical doctors in the State of Washington who are employed in and paid by public institutions operating directly with funds raised entirely or in part from the taxpayers of the State of Washington."[3] Some of the defendant hospitals

---

any child under the age of eighteen years:

\* \* \* \* \*

"(12) who is grossly and wilfully neglected as to medical care necessary for his well-being."

RCW 13.04.095 provides:

"*Commitment of child—Order of court—Powers of department of institutions—Order rescinded when reformation complete.* When any child shall be found to be delinquent or dependent, within the meaning of this chapter, the court shall make such order for the care, custody, or commitment of the child as the child's welfare in the interest of the state require. Subject to further order, the court may commit the child:

"(1) To the care of such child's parents, subject to supervision of the probation officers; or

"(2) To the custody of a probation officer, subject to such conditions as the judge may impose; or

"(3) To a reputable citizen or association able and willing to receive and care for such child; or

"(4) To an appropriate private agency authorized to care for such children; or

"(5) To the department of public assistance; or

"(6) To the department of institutions \* \* \*

"In no case shall a child be committed beyond the age of twenty-one years. A child committed to the department of institutions shall be subject to the supervision and control thereof and the department shall have the power to parole such child under such conditions as may be prescribed.

"The department of institutions shall have the power to discharge such child from custody, and the court shall have the power to rescind the commitment of such child, whenever his or her reformation shall be deemed complete."

2. In certain instances, the superior court judges also entered orders authorizing blood transfusions of adult Jehovah's Witnesses over the strenuous objections of the adults. This court dismissed those aspects of the case involving the adult Jehovah's Witnesses. See June 8, 1967 Memorandum Decision, pages 491–494 and Addendum, pages 494–498.

3. In pretrial order No. 2 the description of this class of physicians also included the clause "or operating under funds granted to said hospitals by the United States Government." In their proposed findings of fact plaintiffs deleted this clause.

A second class of physicians was also designated in the complaint, namely, "all medical doctors in the State of Washington." (Complaint, page 14) However, in pretrial order No. 2, which superseded the pleadings, this class of physicians was eliminated. (Pretrial order No. 2, page 35) In their "Additional Proposed Findings of Fact," plaintiffs seek to reinstate this class of defendant physicians. (Additional Findings of Fact, page 1) Pretrial order No. 2

were also sued not only individually but also as representatives of a class which includes all hospitals in the State of Washington operated by the state, a county, or by any public hospital district.[4]

The action is brought as a civil rights action pursuant to 42 U.S.C. § 1983, claiming that the actions of the state judges under RCW 13.04.010(12) and 13.04.095 violated plaintiffs' federally-guaranteed constitutional rights and asserting that in all probability similar violations of the Constitution will occur unless precluded by intervention of a federal court. Accordingly, plaintiffs seek declaratory and injunctive relief which will stop this practice for the future. Plaintiffs do not seek monetary damages for past deprivations.

Plaintiffs sought and obtained the convening of a special three-judge district court pursuant to 28 U.S.C. §§ 2281 and 2284. This request was made and granted because plaintiffs seek to enjoin the enforcement of a state statute[5] of general application on the ground of invalidity under the federal Constitution.

The gist of the plaintiffs' complaint is that the defendant physicians, hospitals, hospital personnel, superior court judges and juvenile court employees have used the Juvenile Court Law to obtain court orders removing the children of Jehovah's Witnesses from the custody of their parents who refuse on medical and religious or personal grounds to consent to blood transfusions for their children once the children have been placed in the care of a physician. The court order makes the child a ward of the court and authorizes blood transfusions to be given to him when the attending physician determines the transfusion is necessary. This court order is obtained despite the fact that plaintiffs allegedly have given or have sought to give in each instance to the hospitals or doctors affected a written release discharging the hospitals or doctors from any and all liability for any untoward results arising from plaintiffs' refusal to accept blood transfusion for their children. Implicit in the issuance of these court orders is the finding by the court that the Jehovah's Witnesses, despite their attempt both to provide proper medical care for their children and to comply with the tenets of their faith, have been wilfully and grossly neglectful as to the medical care necessary for the well-being of their children.

Plaintiffs assert that the application of the Juvenile Court Law under these circumstances violates fundamental rights and liberties secured to them under the Constitution of the United States. Plaintiffs principally contend:

1. That the actions of the defendants deprive plaintiffs of their rights under the First Amendment to freedom of association, to the free exercise of their religion and to freedom from the fashioning of any laws respecting the establishment of religion, which rights are made applicable to the states by the Fourteenth Amendment.

2. That plaintiffs have been denied life, liberty and property without due

---

(page 45a), provides that that pretrial order shall not be amended "except by order of the Court pursuant to agreement of the parties or to prevent manifest injustice." Plaintiffs have not sought nor obtained court authority to amend pretrial order No. 2 by reinstating this class of physicians, and therefore the same may not be regarded as a class of defendants subject to the jurisdiction of this court in this cause.

4. In the complaint the class of defendant hospitals was described more broadly as "all licensed hospitals in the State of Washington." (Complaint, page 14)

However, the class of defendant hospitals was narrowed in pretrial order No. 2, as noted above. (Pretrial order No. 2, page 35) In their "Additional Proposed Findings of Fact," plaintiffs seek to add a second class of defendant hospitals, conforming to the broad class of defendant hospitals described in the complaint. (Additional Findings of Fact, page 2) However, for the reasons stated in note 3 above, this second class of hospitals may not be regarded as a class of defendants subject to the jurisdiction of this court in this cause.

5. See footnote 1.

process of law under the Fifth Amendment, made applicable to the states by the Fourteenth Amendment.

3. That plaintiffs have been denied their right of family privacy protected by virtue of the Ninth and Fourteenth Amendments.

4. That plaintiffs have been denied equal protection of the laws of the State of Washington in that the state has protected the religious liberty and parental rights of all other citizens and all other religious denominations except the plaintiffs.

5. That the actions of superior court judges of the State of Washington in compelling blood transfusions over the protests of plaintiffs has caused animosity toward plaintiffs and has interfered with their right of association by making it more difficult for plaintiff, Watch Tower Bible and Tract Society, and individual plaintiffs to attract and hold members for their social and religious purposes. Further, because of the acts taken pursuant to the challenged statute, a member of the Jehovah's Witnesses living in or visiting the State of Washington knows that his conscience and religion will not be respected and his family privacy is not as safe as that of the members of all other religious groups.

6. That plaintiffs are a respectable people who have a deep sense of responsibility and who seriously endeavor to care for their families in harmony with Christian principles as set forth in God's Word, the Holy Bible, and that they have a right to decide what medical treatment they will accept for their children.

7. That the defendant physicians and hospital officials are committing an unlawful assault forbidden by law in forcing medical treatment upon the children of Jehovah's Witnesses contrary to express parental authority. Since Jehovah's Witnesses are exercising parental discretion in order to care for their children's welfare as best they can, there

is no lawful basis under the *parens patriae* power of the state for the state's alleged unlawful and unconstitutional interference with the exercise of parental authority and discretion when a Jehovah's Witness in good faith disagrees with a doctor about medical treatment for his child involving blood transfusion.

8. That plaintiffs will be irreparably injured unless the defendants are permanently enjoined from continuing to apply the Juvenile Court Law to plaintiffs in the manner constitutionally challenged in this action.

With regard to declaratory relief as to the minors involved, plaintiffs seek a decree declaring that RCW 13.04.010 (12) and RCW 13.04.095, provisions of the Juvenile Court Law of the State of Washington, are invalid under the Constitution of the United States, as applied by defendants in making children of Jehovah's Witnesses wards of the state court for the purpose of authorizing compulsory blood transfusions.[6]

Concerning injunctive relief, plaintiffs seek to: (1) enjoin defendant state judges, "their representatives, agents and successors" from declaring children of plaintiffs or members of plaintiffs' class to be dependent children and wards of the court, pursuant to RCW 13.04.010 (12) and RCW 13.04.095, "solely on a finding that the parents have refused transfusion of blood on religious or medical grounds," and from entering orders authorizing blood transfusions of such children; (2) enjoin named defendant doctors, hospitals, hospital personnel, "their representatives, agents, employees, attorneys and successors" from bringing any civil proceeding for the purpose of enforcing or applying RCW 13.04.010 (12) and RCW 13.04.095 to Jehovah's Witnesses so as to compel blood transfusions of the children of Jehovah's Witnesses contrary to the stated religious and medical objections of the parents; (3) enjoin the same defendant doctors,

---

6. Plaintiffs also sought a declaratory judgment and injunctive relief with respect to blood transfusions administered to adults.

This aspect of the case was dismissed. See footnote 2, supra.

hospitals, etc. from in any way seeking to impose or force blood transfusions on the children of Jehovah's Witnesses against the will of their parents with or without court orders; and (4) enjoin all physicians in the State of Washington as a class, and all hospitals in the State of Washington as a class, in keeping with the requested injunctive provisions described above.

Before the court for a decision on the merits, then, are the ten cases involving the children of Jehovah's Witnesses and enumerated in pretrial order No. 2 wherein oral or written orders [7] were obtained from superior court judges of the State of Washington pursuant to the challenged state statute.

In each of the ten enumerated cases, Jehovah's Witnesses have based their refusal to consent to blood transfusions on their religious beliefs and medical objections regarding the use of blood. Plaintiffs believe and accept as authoritative and binding upon them the admonition of Almighty God Jehovah found in the Holy Bible commanding Christians to "abstain from blood." [8] Their belief places a positive religious duty on the father in particular to provide for his children and to apply their religious views, including abstinence from blood, in the family circle. In this connection, it is the responsibility of the father to see that no member of his family receives a blood transfusion, and no court or other official body can relieve him of that responsibility. If a plaintiff receives a blood transfusion, this could, in the view of the plaintiffs, mean permanent spiritual harm to both the child and parent or adult.

7. Oral orders issued in the cases involving the Maydole child and the Hardy child; written orders were entered in the eight remaining cases involving the Elam child, the Lawrence child, the Smith child, the Seelye child, the Burnitt child, the Pen child, the Brockman child, and the Nichol child. Blood transfusions were actually administered to five of the ten children made wards of the Juvenile Court for such purpose, that is, to Bradley Scott Seelye, Thomas Allen Burnitt, Michael Pen, Sharilyn Brockman, Geri Lynn Nichol. Although the other five children had been removed from the custody of their parents and declared wards of the Juvenile Court to permit them to receive compulsory blood transfusions, blood transfusions were not in fact given to Russell Scott Maydole, Jeffrey Ward Elam, Heidi Jo Lawrence, Jeanetter Smith and Loren Hardy. Five of the cases involved birth defects; erthroblastosis fetalis was diagnosed for the Maydole, Seelye and Brockman children; congenital defects requiring surgery correction were diagnosed for the Lawrence and Nichol children. The five remaining cases involved a peptic ulcer with gastric intestinal hemorrhaging (Burnitt); osteomyelitis and generalized staphylococcal infection (Pen); damaged pancreas with possible internal bleeding (Elam); severe burns (Hardy); injuries (Smith). In none of the cases is it recorded that the judges heard contrary medical testimony relating to the risks involved in blood transfusions. Little, if any, notice was given to the parents of the children regarding the hearing to determine if the children were "grossly and wilfully neglected as to the medical care necessary to their well-being." No notice was given in the Seelye case; it is not apparent from the record whether the parents of the Pen and Brockman children were given any notice or were present at the hearing; the Smiths were given one hour notice of the hearing. Blood transfusions were actually administered to the Nichol child before the hearing was completed and the court order making her a ward of the court was signed.

8. The foundation for the belief of the Jehovah's Witnesses respecting blood transfusions is found in the following quotation from Acts of the Apostles, chapter 15, vs. 20:

"Hence my decision is not to trouble those from the nations who are turning to God, but to write to them to abstain from things polluted by idols and from fornication and from what is strangled and from blood."

and the quotation from Leviticus, 17th chapter, vs. 10:

"As for any man of the house of Israel or some alien resident who is residing as an alien in your midst, who eats any sort of blood, I shall certainly set my face against the soul that is eating the blood, and I shall indeed cut him off from among his people."

According to the Jehovah's Witnesses, blood transfusions involve certain risks, are of limited value, and there are alternative means of treatment which makes the use of such therapy unnecessary and inadvisable.[9] With respect to this view, plaintiffs contend that in the cases at issue doctors have never testified as to the hazards, dangers or uncertainties of blood transfusions, and the alternative means of treatment have not been placed before any of the superior court judges.

Nevertheless, it is the prevailing medical view that blood transfusions are not only safe but necessary in those kinds of situations presented to the court in the specific instances involving the minor plaintiffs in this case.[10]

As previously noted, plaintiffs argue that RCW 13.04.010(12) and RCW 13.04.095 are invalid under the Constitution of the United States as applied by defendants in compelling the minor children of Jehovah's Witnesses to submit to blood transfusions over the religious

9. Plaintiffs rely on evidence they contend establishes that their views are scientifically supportable, since in the area of blood transfusion knowledge is rapidly expanding, opinions are changing, hazards exist, alternative means of treatment are possible and doctors disagree. The plaintiffs offered evidence tending to show that, as to many types of situations where blood transfusions are often given, there exists medical opinion that transfusions are of little value and, in addition, may substantially harm the patient. They have also offered evidence tending to show that there is opinion that blood transfusions are never indicated, since there are always treatments available which are better than transfusions.

Dr. Exner testified specifically that transfusions are contraindicated as treatment for continued gastrointestinal bleeding (Transcript, page 208), and erythroblastosis fetalis (Transcript, page 210), and that better treatments always exist for excessive hemorrhaging during major surgery (Transcript, page 212). He also testified that transfusions are never mandatory (Transcript, page 254).

Dr. Riggle, an osteopathic surgeon and Jehovah's Witness from Texas, testified that he had found no cases in which blood transfusions were mandatory (Transcript, page 267) and, in particular, that in his experience alternate therapy was satisfactory for erythroblastosis fetalis.

Dr. Lodi, a surgeon and Jehovah's Witness since 1950, testified that he has not used transfusions since 1950, and no one has died from non-transfusions (Transcript, page 149). However, he had not treated any cases of severe blood loss due to trauma, except one in which the victim was transfused under a court order over his objection.

Dr. Wilson, senior pathologist, King County Coroner's Office, knew of no cases in his experience in which death or disability resulted from failure to give a blood transfusion. (Transcript, page 83). However, he also testified that there are instances where transfusions are lifesaving (Transcript, page 113) and that transfusions were accepted medical practice in King County (Transcript, page 139).

10. The defendants have admitted that there is often substantial difference of opinion regarding the value of blood transfusions in specific instances. However, they offered proof tending to show that, for some conditions, informed medical opinion agrees that death or disability is very probable if no transfusion is given, and that the probability of recovery in such cases can be appreciably increased only if a transfusion is given. Dr. Guntheroth specifically mentioned that in profound anemia accompanied by generalized severe infection transfusion is essential to save life, and blood substitutes are of no value (Transcript, page 359). He was also of the opinion that blood transfusions are necessary to save life after severe loss of blood due to accident, and also when a baby is suffering from acute erythroblastosis fetalis (Transcript, pages 391–92), and that most, if not all, medical authorities agree to this (Transcript, page 392).

Dr. Eloise Rosalee Giblett, who testified by deposition, noted that the medical opinion held by the great majority of practitioners in this medical community, in this country, and in the world is that there are people who would die if they were not otherwise transfused. (Deposition, page 6).

It was the considered opinion of the attending physicians in each of the cases retained in the action that a blood transfusion was or would be vital to save the life of the patient.

objections of the parents. According to plaintiffs, the reason these statutes are invalid as so applied is because they facilitate state impairment of plaintiffs' religious freedom, contrary to the First and Fourteenth Amendments, and plaintiffs' parental rights as guaranteed by the Due Process Clause of the Fourteenth Amendment.

Substantially the same argument was advanced by Jehovah's Witnesses in Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, involving an appeal from convictions for violating Massachusetts' child labor laws. Contrary to those state laws, the aunt and custodian of a nine-year-old girl permitted and encouraged the girl to sell Bible tracts on the public streets. The aunt contended that the child was exercising her right, under the First and Fourteenth Amendments, to preach the gospel. She buttressed this argument with a claim of parental right as secured by the Due Process Clause of the Fourteenth Amendment.

The Supreme Court affirmed the judgment, holding that the family is not beyond regulation in the public interest, as against a claim of religious liberty. Among other things, the Court said:

" * * * neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A.

187. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." (Footnotes omitted) 321 U.S. at 166–167, 64 S.Ct at 442.

" * * * Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." 321 U.S. at 170, 64 S.Ct. at 444.

It appears to us that the holding of *Prince* is applicable here and that our special three-judge court is bound by that decision. Thus, whatever merit there be in plaintiffs' argument that a more thorough consideration of philosophic principles calls for a contrary conclusion, we are not in a position to decide contrary to *Prince*. It need only be added that our case, as was also true in *Prince*, does not involve any of the rights of parents to train and indoctrinate their children in religious matters.

It is true that in *Prince*, the court made it clear that it did not intend that opinion to lay the foundation for every state intervention in the indoctrination and participation of children in religion which may be done in the name of their health and welfare. (321 U.S. at 171, 64 S.Ct. 438). But we think it does lay the foundation, binding upon us, for the particular state intervention in the name of health and welfare which is here under review. As stated in *Prince*, 321 U.S. at 166, 64 S.Ct. at 442, "The right to practice religion freely does not include liberty to expose * * * the child * * * to ill health or death."

In this special three-judge court case we are not bound by any judicial

decisions other than those of the United States Supreme Court. But it is appropriate to note that in People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 774, 30 A.L.R.2d 1132, testing the validity of a court order declaring the minor child of Jehovah's Witnesses a dependent child for the purpose of compelling a blood transfusion, the Supreme Court of Illinois construed the *Prince* case as we do here. Thus, on the basis of the *Prince* decision, the Illinois court held that the Juvenile Court Law of that state is not unconstitutional as so applied. In an exhaustive opinion the Supreme Court of New Jersey similarly interpreted *Prince* in a blood transfusion case involving the minor child of Jehovah's Witnesses. See State v. Perricone, 37 N.J. 463, 181 A.2d 751, 756, 757. See also, Hoener v. Bertinato, 67 N.J. Super. 517, 171 A.2d 140, 143.

We therefore hold, on the compelling authority of *Prince* that RCW 13.04.010(12) and RCW 13.04.095 are not invalid under the Constitution of the United States, as applied in this case.

Assuming, nevertheless, as plaintiffs contend, that the *Prince* case is not dispositive of the main action because (1) the supreme court specifically limited the *Prince* holding to the facts of the case, and (2) the supreme court to date has not passed on the merits of the constitutional questions involved in the blood transfusion cases, this court would have before it an open question on the merits of the case. If this be the case sound judicial administration would warrant the application of the equitable abstention doctrine [11] with respect to the federal questions raised by plaintiffs' constitutional attack on the state statute.

Equitable abstention is designed to restrict the exercise of federal jurisdiction, at least in the first instance, by having the federal courts defer to the state courts in the consideration and interpretation of state statutes. Because the award of equitable relief is traditionally regarded as a discretionary matter, the court should properly consider whether the circumstances warrant the initial construction of the statute in question by the highest court of the state and, if so, abstain from the exercise of federal jurisdiction.

Where the constitutionality of a state statute, as in the instant case, is involved, there are sound reasons why any uncertainty as to its meaning should first be resolved by the state. The policy of comity between state and federal governments suggests one reason why the interpretation of a state statute should first be rendered by state authorities. Also, state courts ideally should be better informed about state policies and purposes so that construction of the statute may be achieved more accurately and

[11]. When state action is challenged in a federal court on federal constitutional grounds and there are questions of state law which may dispose of the case or materially change the nature of the constitutional problems, the federal court may decline to proceed though it has jurisdiction under the Constitution and the statutes. This abstention policy is usually referred to as the *Pullman* doctrine from the case of Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The company in that case sought to enjoin the enforcement of an order of the Texas Railroad Commission on the grounds that the order denied the company rights under the Fourteenth Amendment and that the Commission lacked authority under Texas law to make the order in question. A unanimous supreme court ordered the trial court to abstain from deciding the case so that the state court could decide the state issues. In this way the federal court avoided deciding federal constitutional questions prematurely or unnecessarily; for if the state court held the order unauthorized as a matter of state law, there would be no need for the federal court to pass on the federal questions. Abstention is proper in order to avoid "unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965).

meaningfully. In this connection, the supreme court in *Prince,* unlike this court, had the benefit of the construction placed on the statute therein involved by the Massachusetts high court. The supreme court noted that the decision of the Massachusetts court on what constituted a "sale" or "offer of sale" differed from the trend in other states, but that the supreme court was bound by the state determination, 321 U.S. 158, 163, 64 S.Ct. 438, and annotations 5 and 6. More importantly, the resolution of uncertain statutory authority by the state courts may obviate federal adjudication of constitutional questions arising from the enactment.[12]

■ The abstention doctrine, however, is not automatically applied. As already noted, whether the court should exercise its equity powers is a discretionary matter, and the decision to defer action initially depends upon a finding that the special circumstances prerequisite to equitable abstention exist. Since the practical effect of the court's decision to abstain in a case over which it has been given jurisdiction by law is to deny the plaintiff his right to a federal forum,

the decision to abstain not only requires a reasonably uncertain issue of state statutory interpretation, but also the availability of adequate state procedures for resolving the uncertainty.

■ A first prerequisite, then, is that the challenged application of the state enactment be fairly open to interpretation. Where it appears that the statute necessarily had to be interpreted in the manner under attack, no useful purpose would be served by federal abstention to permit the state court to pass upon such application.[13] The abstention doctrine becomes applicable in those situations where it is uncertain that the state enactment authorized the restrictions imposed on the persons bringing the action or on their activities.[14] This condition would appear to be satisfied in the instant case.

The statutory application herein challenged permits a child to be made a ward of the court upon a finding that the child is "grossly and wilfully neglected as to medical care necessary for his well-being." However, it seems pertinent to ask whether "gross and wilful neglect" is

12. See Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), where there was a finding that the state law was uncertain and abstention was ordered. In NAACP v. Bennett, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375 (1959) the supreme court reversed the district court for failing to consider whether the state law was uncertain. Again, the major consideration behind the doctrine of abstention is that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. See e. g., Government & Civic Employees, etc. v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957) ; Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983 (1953) ; Shipman v. DuPre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877 (1950) ; American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946) ; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ; City of Chicago

v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355 (1942) ; Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L. Ed. 971 (1941).

13. See, e. g., Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) ; Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962).

14. See Baggett v. Bullitt, supra note 9 at pages 376–377, 84 S.Ct. 1316, and note 13. Moreover, even where the state court has considered the precise issue constitutionally attacked in the federal court, abstention has been exercised on the ground that the federal constitutional objections had not been presented to the state court and might have caused that court to interpret the statute differently had those objections been presented. City of Chicago v. Achison, T. & S. F. R. R., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958).

a permissible finding under the statute when a parent, upon religious grounds or because of his views as to medical treatment, refuses to consent to blood transfusions for his minor child where the attending physician has determined blood transfusions are medically necessary. As applied here when a Jehovah's Witness desires to provide medical care for his child, but cannot consent to a particular form of medical treatment, such as blood transfusions, determined to be necessary by the attending physician, does the Juvenile Court Law require that child to be characterized as one "grossly and wilfully neglected as to medical care necessary for his well-being?" The statute appears to have two parts: one portion requiring medical care necessary for the well-being of the child, and the other, under a plausible interpretation, providing that the neglect in failing to provide or agree to the medical treatment recommended as necessary be gross and wilful. Although a blood transfusion might be necessary for the well-being of the child, refusal to consent to a blood transfusion, coupled with willingness to consent to substitutes, if any, may not constitute "gross and wilful" neglect. Use of the language "grossly and wilfully" in the statute would thus appear to make the application of the statute to plaintiffs in the blood transfusion cases uncertain.

The second prerequisite to the application of the abstention doctrine is that adequate state procedures exist to resolve the uncertainty of the law. This prerequisite would appear to be satisfied by the Washington Uniform Declaratory Judgments Act, RCW 7.24.020. That statute provides in pertinent part:

"A person * * * whose rights, status or other legal relations are affected by a statute * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration of rights, status or other legal relations thereunder."

Although the cases involving the challenged application of the Juvenile Court Law are moot by the time of appeal, jurisdiction may still be exercised under the state declaratory judgments act. When a matter of public interest is involved the Washington supreme court has retained jurisdiction to decide the broad issues even though the particular case raising them is moot.[15] The

---

15. See National Electrical Contractors Assoc. Puget Sound Chapter v. Seattle School District No. 1, 66 Wash.2d 14, 400 P.2d 778 (1965). In its opinion, the Washington Supreme Court quoted and specifically relied upon the following language from the opinion of the Illinois Supreme Court in a blood transfusion case, People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 772 (1952) as support for the proposition that the court should decide a moot issue where sufficient public interest in the question warrants:

"Before we reach the merits, we meet the State's contention that the case is now moot and should be dismissed because the blood transfusion has been administered, the guardian discharged, and the proceeding dismissed. Because the function of courts is to decide controverted issues in adversary proceedings, moot cases which do not present live issues are not ordinarily entertained. The general rule is that when a reviewing court has notice of facts which show that only moot questions or mere abstract propositions are involved or where the substantial questions involved in the trial court no longer exist, it will dismiss the appeal or writ of error.' People v. Redlich, 402 Ill. 270, 279, 83 N.E.2d 736, 741.

"But when the issue presented is of substantial public interest, a well-recognized exception exists to the general rule that a case which has become moot will be dismissed upon appeal. (See cases collected in 132 A.L.R. 1185.) Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question."

(At 66 Wash.2d 14, 19–20, 400 P.2d 778, 781–782).

**508**

instant case would seem to be a proper one for an application of the Washington Declaratory Judgments Act similar to the one made in the *National Electrical Contractors* case.[16] In the instant case basic rights are thrown into conflict: the *parens patriae* power of the state versus the constitutional and civil rights of Jehovah's Witnesses. In this connection, the public importance in the correct construction of the Juvenile Court Law cannot be doubted, and the superior courts of the state should have the benefit of the construction of this statute by the state supreme court for future guidance in similar situations.

■ The action before us is, in reality, a declaratory judgment action wherein the application of a state statute is being challenged on constitutional grounds; the challenged application presents a question of statutory interpretation not heretofore passed upon by the Supreme Court of the State of Washington. State procedures exist for resolving the issues of construction raised by the application. The essential prerequisites for invoking the doctrine of equitable abstention we believe are present. The policy behind the development of the doctrine—in general to preserve the framework of federalism, and in particular to give the state an opportunity to mold its policy to conform to or accord with constitutional standards—favors utilizing the doctrine in this case. Indeed, resolution of the matter by the state might avoid the constitutional issues presented by the application of the statute.

In sum, if we, as a specially-constituted three-judge court, were to conclude the *Prince* decision not controlling we would then consider the case before us as tailored to the exercise of federal abstention.

For the reasons set forth herein, the plaintiffs are not entitled to the relief sought and the action will be dismissed as to all defendants.

16. Ibid.