Richard BAKSALARY, William Jones, Morris Tucker, and Charles Samuel Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Paul J. SMITH, C. John Urling, Jr., William J. Sheppard, Grace M. Sloan, The State Workmen's Insurance Fund, Pennsylvania Manufacturers' Association Insurance Company, American Mutual Liability Insurance Company, The School District of Philadelphia, Bituminous Casualty Corporation, and all other insurance carriers and/or self-insured employers similarly situated, Defendants.

Civ. A. No. 76–429.

United States District Court, E.D. Pennsylvania.

Feb. 1, 1984.

Harold I. Goodman (argued), Mark B. Segal, David Rudovsky, Rita L. Bernstein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Robert H. Nuttall (argued), Robert T. Lear, Law Dept., School Dist. of Philadelphia, Philadelphia, Pa., for defendant School Dist. of Philadelphia.

Henry H. Janssen (argued), Rawle & Henderson, Philadelphia, Pa., for defendant Bituminous Cas. Corp.

Christopher J. Pakuris (argued), Philadelphia, Pa., for defendant Pennsylvania Manufacturers' Ass'n Ins. Co.

Joseph R. Thompson (argued), Philadelphia, Pa., for intervenor Liberty Mut. Ins. Co.

Leroy S. Zimmerman, Debra K. Wallet (argued), Allen C. Warshaw, Harrisburg, Pa., for "Commonwealth" defendants Paul J. Smith, C. John Urling, Jr., William J. Sheppard, and Grace M. Sloan.

William C. Steppacher (argued), State Workmen's Ins. Fund, Scranton, Pa., for defendant State Workmen's Ins. Fund.

Robert G. Hanna, Jr., Marshall, Dennehey & Warner, P.A., Philadelphia, Pa., for defendant American Mut. Liability Ins. Co.

Before ADAMS, Circuit Judge,* and GREEN and POLLAK, District Judges.

## OPINION

LOUIS H. POLLAK, District Judge.

### I.

Plaintiffs initiated this action in 1976, challenging the constitutionality of certain provisions of the Pennsylvania Workmen's Compensation Act, Pa.Stat.Ann. tit. 77, §§ 1–1031 (Purdon 1952 and Supp.1982). In particular, plaintiffs allege that the "automatic supersedeas" provision of section 413 of the Act, Pa.Stat.Ann. tit. 77, § 774 (Purdon Supp.1982), permits employers and insurers to terminate worker's compensation benefits without according due process of law to those whose benefits are terminated, in violation of the Fourteenth Amendment. The automatic supersedeas terminates benefits without notice to the person receiving benefits. It requires only an employer's or insurer's petition reciting that the benefit recipient has returned to work at the same or higher pay or a petition accompanied by a physician's affidavit averring that the recipient has recovered. Plaintiffs make their due process claim in an action under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (Supp. V 1981).

A decade ago a three-judge panel of this court heard a challenge to section 413's predecessor. In *Silas v. Smith,* 361 F.Supp. 1187 (E.D.Pa.1973), the court considered the case of an individual whose worker's compensation benefits were terminated by his employer's insurer under the automatic supersedeas provision then in effect. The court found no state action in this termination. The court further stated that even had it found state action, it would not have found a violation of the due process clause. The *Silas* court, however, faced these questions at a time when employers and employees could opt out of the Pennsylvania Workmen's Compensation Act. Further, the *Silas* court was not

* Honorable Arlin M. Adams, United States Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

called on to consider the problem of the automatic supersedeas' application to public employees or to employees of employers insured by the State Workmen's Insurance Fund, an insurer administered by state officials. Therefore, as we explain more fully below, the ruling in *Silas* is not controlling with respect to the claims advanced in the lawsuit now before the court. Because the prior decision in *Silas* is not controlling here, it was proper that, after this action was commenced, Judge Fogel ordered that "a three-judge court be convened … in that, pursuant to 28 U.S.C. §§ 2281 and 2284, the complaint raises substantial constitutional issues and requests as relief the enjoining of the enforcement, operation and execution of a state statute."[1]

On March 27, 1978, an order was entered permitting this case to proceed as a plaintiffs' and defendants' class action under Fed.R.Civ.P. 23(b)(2). The plaintiff class includes "all persons who have been or will be receiving benefits pursuant to the Pennsylvania Workmen's Compensation Act and who have had or will have such benefits terminated, suspended, reduced or otherwise deprived without advance notice and opportunity for a prior evidentiary hearing." The defendant class includes "all insurance companies, mutual associations and employment establishments authorized to insure the payment of Pennsylvania Workmen's Compensation benefits who have acted, or will act, to terminate, suspend, reduce, or otherwise deprive benefits to previously eligible claimants without advance notice and opportunity for a prior evidentiary hearing …."

Discovery proceeded for five years. Then, after a series of conferences, the court ordered the parties to submit a set of stipulations during the summer of 1982. Plaintiffs presented their evidence by way of stipulations and affidavits in November. Defendants then moved for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b). This court heard oral argument on April 7, 1983. At that time, we deferred decision

on the 41(b) motion until defendants' evidence had been submitted. Defendants then put in their evidence by stipulations and affidavits. Because plaintiffs offered no rebuttal evidence, the entire case was before us for decision on the merits. This opinion constitutes our findings of fact and conclusions of law.

## II.

This case involves a challenge to one of the methods by which an employer or insurer obligated to pay benefits under the Pennsylvania Workmen's Compensation Act can cease paying those benefits. Through a set of procedures not pertinent to this action, an individual covered by the Act and injured in the course of his employment can obtain the right to receive weekly benefits payments from his employer. The employer must insure against this obligation. Pa.Stat.Ann. tit. 77, § 501 (Purdon Supp.1982); Stipulations of Fact ¶ 16. This requirement may be satisfied in one of three ways: (1) the employer may retain a private insurance carrier licensed to provide worker's compensation insurance; (2) the employer may insure through the State Workmen's Insurance Fund, an insurance fund administered by the state; (3) the employer may self-insure. *Id.* When an employer purchases insurance, the insurer assumes all of the employer's liabilities under the Act and, in effect, stands in the employer's shoes with respect to the employees receiving worker's compensation. *See* Pa.Stat.Ann. tit. 77, §§ 501, 701 (Purdon Supp.1982); *Cease v. Thomas,* 155 Pa. Super. 215, 38 A.2d 547 (1944). Thus, in the ordinary case of an insured employer, the employer has little to do with a compensation matter once the insurer has begun to pay compensation benefits.

When a self-insured employer or an insurer believes that an injured employee who receives compensation benefits has resumed work or recovered his or her health, the employer or insurer will typically seek to terminate the employee's worker's com-

---

1. Congress has repealed section 2281, Pub.L. No. 94–381, §§ 1, 2, 90 Stat. 1119 (1976), but section 2281 still applies to cases filed before the repeal.

pensation benefits. If the employee does not agree to a termination of his benefits, the employer or insurer files a petition to terminate or modify the compensation with the agency which administers the worker's compensation program, the Bureau of Worker's Compensation. Pa.Stat.Ann. tit. 77, § 772 (Purdon Supp.1982). A referee from the Bureau then holds hearings to determine whether grounds for termination or modification exist.

Section 413 of the Act, the subject of this lawsuit, deals with the right to compensation between the time an employer or insurer petitions for termination or modification and the time the referee makes a final determination. Section 413, in pertinent part, provides:

> The filing of a petition to terminate or modify a notice of compensation payable or a compensation agreement or award as provided in this section shall operate as a supersedeas, and shall suspend the payment of compensation fixed in the agreement or by the award, in whole or to such extent as the facts alleged in the petition would, if proved, require only when such petition alleges that the employe has returned to work at his prior or increased earnings or where the petition alleges that the employe has fully recovered and is accompanied by an affidavit of a physician on a form prescribed by the [Bureau of Worker's Compensation] to that effect which is based upon an examination made within fifteen days of the filing of the petition. In any other case, a petition to terminate or modify a compensation agreement or other payment arrangement or award as provided in this section shall not automatically operate as a supersedeas but may be designated as a request for a supersedeas, which may then be granted at the discretion of the referee hearing the case.

Pa.Stat.Ann. tit. 77, § 774 (Purdon Supp. 1982).

Thus, in two sorts of cases an employee receiving benefits can have his benefits terminated pending disposition of his employer's or his employer's insurer's petition to terminate or modify those benefits. The first sort of case is one where the petition alleges that the employee has returned to work at the same or higher wages. The second sort of case is one where the petition alleges that the employee has fully recovered from his disability and the petition is accompanied by a doctor's affidavit averring recovery based upon an examination of the employee within the previous fifteen days.

In either of the two automatic supersedeas situations, the filing of the petition suspends the employer's or insurer's obligation forthwith. Before the employer or insurer can successfully file the petition, however, clerical personnel of the Bureau promptly review the petition

> to determine whether [it has] been properly completed and [complies] in form with the requirements of the [Act] and the Bureau's own rules and regulations. If any deficiency as to form is found, the Bureau rejects the petition and returns it, with notice of the nature of any defect, for correction by the party.

Stipulations of Fact ¶ 51. This review is addressed to formal issues and involves no consideration of the merits of the petition. Stipulations of Fact ¶ 52.

The filing employer or insurer need not serve the employee with a copy of the petition either before or after filing. Instead, the Bureau sends the employee notice of the petition, after filing, at the time (usually no more than five days after receipt of the petition) that the Bureau assigns the matter to a referee. Stipulations of Fact ¶¶ 53, 54.

The employee has no avenue to contest application of the automatic supersedeas other than his defense on the merits of the petition before the referee. Referees typically take one year or more to decide contested cases. Stipulations of Fact ¶ 63. Even if he ultimately has his benefits restored retroactively, an employee subject to an automatic supersedeas will find himself without worker's compensation benefits from the time that the Bureau of Worker's Compensation performs its clerical review

of his employer's or insurer's petition until the time a referee decides the case. Plaintiffs contend that this constitutes a deprivation of that employee's property interest in his compensation benefits without according the employee due process of law.

We have permitted this action to proceed as both a plaintiffs' and defendants' class action. The plaintiff class includes those as to whom the automatic supersedeas provision has been or may be invoked. The defendant class includes all those who have invoked or may invoke the automatic supersedeas. Delimination of these classes requires explanation of the Workmen's Compensation Act's coverage.

The Act covers all "employees" of "employers." An "employee" is defined as any non-casual worker who performs service for another under the other's control. Pa.Stat.Ann. tit. 77, § 22 (Purdon Supp.1982). The Act excludes elected officers of the state or any of its political subdivisions, *id.*, and domestic workers, Pa.Stat.Ann. tit. 77, § 676 (Purdon Supp.1982). "Employers" include "natural persons, partnerships, joint-stock companies, corporations for profit, corporations not for profit, municipal corporations, the Commonwealth, and all governmental agencies created by it." Pa.Stat.Ann. tit. 77, § 21 (Purdon 1952). The Act does not cover federal workers.

> To the extent it applies, the [Act] covers all injuries or occupational diseases occurring in Pennsylvania, regardless of the place of hire. The Act also applies to injuries incurred outside of the Commonwealth where the employee is: (1) principally employed in Pennsylvania; (2) hired in Pennsylvania with employment not principally localized in any state; (3) hired in Pennsylvania with employment principally localized in another state which does not cover that injury in its own workers' compensation law; or (4) hired in Pennsylvania for employment outside the United States or Canada.

Stipulations of Fact ¶ 5.

Before 1974, employees and employers had the option of declining coverage under the Act. Employers and employees were presumed to accept application of the Act. They could, however, file a notice with the Bureau and avoid the Act's application to their employment relationship. Pa.Stat. Ann. tit. 77, §§ 461, 462 (Purdon 1952) (repealed and replaced with unrelated language 1974). The Pennsylvania Legislature has since made the statute mandatory. Act No. 263, § 5, 1974 Pa.Laws 782, 784, *codified at* Pa.Stat.Ann. tit. 77, § 461 (Purdon Supp.1982). Thus, all possible class members are in fact class members in this action.

This case now has four remaining individual plaintiffs who represent the class. Richard Baksalary [2] injured his left achilles tendon while working for the Midvale-Heppenstall Company. Midvale-Heppenstall had insured with the Pennsylvania Manufacturers' Association Insurance Company ("PMAIC") which paid compensation benefits to Mr. Baksalary from December 27, 1973, until June 12, 1974. On the basis of a June 11 examination by one Dr. Cassidy, PMAIC filed a first petition for termination of Mr. Baksalary's compensation benefits on July 19, 1974, invoking the automatic supersedeas. On August 2, however, PMAIC again began to pay Mr. Baksalary's benefits. Then, on October 25, PMAIC again reversed its field, and stopped paying Mr. Baksalary. On November 22, PMAIC filed a second petition for termination alleging that Mr. Baksalary had recovered as of June 11. PMAIC attached an affidavit of Dr. Cassidy and again invoked the automatic supersedeas. Mr. Baksalary first received notice of the November 22 filing on December 4. Three years later, on December 1, 1977, a referee determined that PMAIC had been on sound ground in discontinuing the payment of benefits to Mr. Baksalary but that it still remained liable for any treatment costs related to Mr. Baksalary's injury, subject to a credit for benefit payments made after June 11, 1974.

---

**2.** We base this account upon the parties' Stipulations Concerning Plaintiff Richard Baksalary and Defendant Pennsylvania Manufacturers' Association Insurance Company.

Plaintiff William Jones [3] suffered an injury while employed as a truck driver for the Tri-County Hauling Company. American Mutual Liability Insurance Company insured Tri-County against worker's compensation liability. Mr. Jones and American Mutual entered an agreement for payment of compensation benefits beginning on December 5, 1973. American Mutual stopped paying benefits on May 5, 1974, and filed a petition to terminate Mr. Jones' benefits on June 11. Based upon a physician's affidavit that an examination of May 29 showed Mr. Jones' recovery, American Mutual invoked the automatic supersedeas at the time of its June 11 petition. The Bureau of Worker's Compensation mailed notice of Mr. Jones' termination on June 16. Three years later, on August 11, 1977, a referee found that Mr. Jones had not recovered in May of 1974, and ordered American Mutual to pay retroactive benefits to Mr. Jones with interest at ten percent per annum.

Morris Tucker [4] injured his back while packing meat for S. Lotman & Sons, Inc. Bituminous Casualty Corporation insured Lotman. Bituminous and Mr. Tucker agreed that Bituminous owed Mr. Tucker compensation payments beginning November 9, 1973. On July 17, 1974, Bituminous filed a petition to terminate Mr. Tucker's benefits and invoked the automatic supersedeas. Bituminous had not attached a physician's affidavit, but had typewritten on the petition that "J. David Hoffman, M.D. certifies that Morris T. Tucker was able to return to work on July 3, 1974." This apparently sufficed, because Bituminous paid nothing to Mr. Tucker until a referee issued a decision on August 21, 1975, in favor of Mr. Tucker. Bituminous appealed that decision, but the parties settled on December 19, 1977. During the period of his termination, Mr. Tucker received income from welfare, Social Security

Disability Insurance, and his wife's employment.

Charles Samuel had two experiences with the automatic supersedeas provision of section 413.[5] Mr. Samuel worked for the Pennsylvania Liquor Control Board when he hurt his back. The State Workmen's Insurance Fund ("SWIF") insured the Liquor Control Board. As described more fully in section III(B)(2)(b) of our opinion, "S.W.I.F. is a legislatively created and state-operated insurance carrier from which workers' compensation insurance policies may be purchased by employers to cover all risks of liability under the Act, including employers who have been rejected or cancelled by private insurance carriers." Stipulations of Fact ¶ 22.

SWIF began paying compensation to Mr. Samuel as of February 28, 1975. SWIF first terminated these payments on October 7, 1975, on the basis of an examination of Mr. Samuel by Dr. Williams. SWIF petitioned to terminate Mr. Samuel's compensation on October 17 and invoked the automatic supersedeas. The first notice that Mr. Samuel received of the petition was a copy mailed to him by the Bureau on November 7. A referee denied SWIF's petition and awarded retroactive compensation benefits with interest almost eleven months later, on September 20, 1976.

On June 27, 1977, SWIF again filed a petition to terminate Mr. Samuel's benefits. SWIF attached the affidavit of Dr. Stiffel, who had conducted an examination on June 21, and SWIF invoked the automatic supersedeas. A copy of this petition was mailed to Mr. Samuel on July 1. A referee denied SWIF's petition on January 5, 1978, and SWIF appealed. SWIF did not resume payments until the administrative appeal board remanded the case to the referee on April 10, 1978. The referee clarified his January 5, 1978, order on March 19, 1979,

---

3. We base this account on the Stipulations Concerning Plaintiff William Jones and defendant American Mutual Liability Insurance Company.

4. We take this account from the Stipulations Concerning Plaintiff Morris Tucker and Defendant Bituminous Casualty Corporation.

5. *See* Stipulations Concerning Plaintiff Charles Samuel and Defendant S.W.I.F.

to award Mr. Samuel retroactive benefits and ten percent per annum interest.

### III.

A claim under section 1983 alleging a violation of the due process clause of the Fourteenth Amendment requires proof of three elements. First, a section 1983 claimant must show a deprivation of a constitutionally protected liberty or property interest. Second, the claimant must show that the deprivation was accomplished "under color of state law" and as a result of "state action;" these turn out to mean the same thing. Third, the claimant must show that the method by which the deprivation was effectuated involved a denial of due process—in this case, procedural due process. We proceed to consider each of these elements in turn.

### A. *Deprivation*

■ As we discussed in the previous portion of this opinion, section 413 permits an employer or insurer summarily to suspend worker's compensation payments to an injured employee formerly entitled to those benefits. The employee may protest this suspension and he may obtain a hearing before a referee. The referee may, of course, determine that the employee was no longer entitled to benefits at the time of the petition.[6] However, the referee may find that the employee had a continuing disability or that he had not returned to work. This finding would dictate a decision that the employer or insurer should not have terminated the employee's benefits. In that case, the referee will award the payment of retroactive benefits under Pa.Stat.Ann. tit. 77, § 772 (Purdon Supp. 1982). Referees, though, typically take one year or more to decide a case. Stipulations of Fact ¶ 63.

We find that when an individual must forego the use of his compensation benefits for as long as one year, even if he receives

---

6. The parties devoted considerable effort to establishing the rate at which referees find for employees when the employee contests a termination petition involving an automatic supersedeas. It is to be noted that the employee cannot effectively challenge the supersedeas itself. Rather, the employee contests the underlying petition to terminate; the supersedeas operates in the interim.

Plaintiffs commissioned two statistical studies, one in 1978 and one in 1981. Stipulations of Fact ¶ 102. Plaintiffs now rely only on the 1981 report by Professor Bernard Siskin of the Temple University Statistics Department. *See* Stipulated Exhibit 58 (Supplemental Statistical Study of the Automatic Supersedeas Process Under the Pennsylvania Worker's Compensation Act). Based on a sample of 211 files, Professor Siskin calculates the "reversal" rate—the rate of referee awards more favorable to employees than complete termination—at 41.7% of all contested automatic supersedeas cases. Professor Siskin's calculations also suggest a much higher "reversal" rate when the employee has legal representation: Professor Siskin estimates a "reversal" rate of 77.9% where the employee is represented, but of only 24.6% where the employee has no lawyer.

Defendants dispute Professor Siskin's study. *See* Stipulations of Fact ¶¶ 117–121. Defendants employed Mr. Lester V. Jackson, a former director of claims operations for PMAIC, to critique Professor Siskin's analysis. *See* Stipula-

tions of Fact ¶¶ 110–116; Defendant's Exhibit D–5 (Survey and Study Report Submitted by L.V. Jackson). Mr. Jackson concludes that Professor Siskin's data only support a finding that referees decide unfavorably to employers or insurers in 9% of contested automatic supersedeas cases. Exhibit D–5, p. 8. Professor Siskin's statistical tests allow him to be 99% confident that the actual "reversal" rate substantially exceeds 9%. Stipulated Exhibit 58, p. 5. Mr. Jackson's disagreement with Professor Siskin comes not from an assertedly superior statistical analysis. Rather, Mr. Jackson and Professor Siskin disagree on the proper classification of cases and outcomes; Professor Siskin counts some results as employee "wins" which Mr. Jackson counts as favorable to the insurer. *See* Stipulations of Fact ¶¶ 117–120.

We do not need to resolve the technical issues involved in the parties' statistical dispute. The undisputed data show that (1) in contested automatic supersedeas terminations it is not a rarity for the referee ultimately to determine that the employee is entitled to an award more favorable than the complete termination of benefits authorized by section 413, and (2) the time-lag between automatic termination and the referee's curative award averages one year. We conclude that the interim deprivation of enjoyment of benefits to which a worker has a statutory entitlement occurs frequently enough and lasts long enough to rise to a level of constitutional significance.

reimbursement at the end of that period,[7] that individual has undergone the deprivation of a constitutionally protected property interest. During the period of termination, he has lost significant income. He will find this income difficult to replace through borrowing in the market because he has no way of convincing a lender that a referee will eventually award benefits to him; most lenders are likely to assume otherwise. In a similar case involving termination of Social Security Disability Insurance benefits pending a final hearing, the Supreme Court stated that it "has been implicit in our prior decisions ... that the interest of an individual in continued receipt of these benefits is a statutorily created 'property' interest protected by the Fifth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (citations omitted).[8] We see no distinction for this purpose between the federal disability benefits at issue in *Mathews* and the state disability benefits at issue in this case.[9]

## B. *State Action*

The Civil Rights Act of 1871 creates a private right of action against

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ....

42 U.S.C. § 1983 (Supp. V 1981). Plaintiffs here complain that the automatic supersedeas fails to accord them their constitutional right to due process before depriving them of their property interest. Because the Fourteenth Amendment creates this due process right, the right only runs against a "state." Thus, plaintiffs must show a deprivation by defendants which satisfies both section 1983's "under color of state law" requirement and the Fourteenth Amendment's "state action" requirement. The Supreme Court has stated, however, that "[i]f the challenged conduct ... constitutes state action as delimited by our prior decisions, then that conduct was also action under color of state law and will support a suit under § 1983." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); *accord Jack-*

---

**7.** Section 406.1 of the Workmen's Compensation Act, Pa.Stat.Ann. tit. 77, § 717.1 (Purdon Supp. 1982), requires payment of interest at ten percent per annum by employers or insurers "on all due and unpaid compensation ...." By its terms this section arguably applies only to delay in providing initial compensation payments after an employee claims a right to benefits. The parties have not stipulated that section 406.1 applies to awards of retroactive benefits upon an unsuccessful petition to terminate invoking the automatic supersedeas. Similarly, we have found no court which has held section 406.1 applicable. However, referees in the cases of two of the named plaintiffs did award interest at the rate of ten percent per annum on retroactive benefits awards. *See* Stipulations Concerning Plaintiff William Jones and Defendant American Mutual Liability Insurance Company ¶ 24; Stipulations Concerning Plaintiff Charles Samuel and Defendant S.W.I.F. ¶ 36. We therefore assume that section 406.1 applies here.

**8.** One should note that in *Mathews* a terminated benefits recipient who showed a continuing disability could recover back benefits. 424 U.S. at 339, 96 S.Ct. at 904. Even so, "Eldridge ... raised at least a colorable claim that because of his physical condition and dependency upon the

disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments." 424 U.S. at 331, 96 S.Ct. at 901.

**9.** The automatic supersedeas terminates an employee's benefits. Some individuals subject to the automatic supersedeas should not have their benefits "terminated," but rather "suspended." An individual with "suspended" benefits does not receive regular checks. However, if such an individual incurs any medical expenses attributable to his work-related injury, he can receive reimbursement from his employer or his employer's insurer. Stipulations of Fact ¶ 46(c). An individual subject to the automatic supersedeas who has returned to work at a higher wage may still have continuing medical problems associated with his injury. He cannot receive the medical benefits to which the statute entitles him because of the automatic supersedeas. This may alter the pattern of medical treatment which he can obtain. This alteration would constitute a deprivation not recompensable by a subsequent award of retroactive benefits and interest.

*son v. Temple University,* 721 F.2d 931, 932–933 (3d Cir.1983); *Community Medical Center v. Emergency Medical Services,* 712 F.2d 878, 879 n. 3 (3d Cir.1983). We therefore need only embark on one unified inquiry for purposes of the due process clause and section 1983.

Our primary guidance in that inquiry comes from three recent Supreme Court opinions. *See Lugar v. Edmondson Oil*

*Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982);[10] *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982);[11] *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).[12] Since the Supreme Court's state action trilogy, the Court of Appeals for the Third Circuit has given some further guidance[13] on the issue of state action. *See Jackson v. Temple University,* 721 F.2d

---

**10.** *Lugar* involved a challenge to a Virginia prejudgment attachment statute.

> The prejudgment attachment procedure required only that respondents allege, in an *ex parte* petition, a belief that petitioner was disposing of or might dispose of his property in order to defeat his creditors. Acting upon that petition, a clerk of the state court issued a writ of attachment, which was then executed by the county sheriff.

457 U.S. at 924, 102 S.Ct. at 2747. The Court found sufficient state involvement in this process to make the private creditor's attachment under the Virginia statute state action.

**11.** *Rendell-Baker* involved a teacher's suit against her former employer. The former employer, a school for maladjusted high-school students, received virtually all its income from tuition paid by state or local governmental authorities. Under the pertinent Massachusetts statute, these state and local authorities had an obligation to provide special education through private schools where public schools were not equipped to provide such education. The Court found insufficient relationship between the government authorities and the school to make termination of the teacher state action.

**12.** In *Blum* the Court considered a challenge to procedures by which New York nursing homes determined whether to transfer Medicaid patients from higher-care to lower-care facilities. Even though (a) most such institutions received large amounts of state funding, (b) the state regulated the institutions carefully, and (c) the state typically adjusted patients' Medicaid benefits on the basis of the nursing homes' transfer decisions, the Court found no state action.

**13.** Plaintiffs have suggested in another context that decisions of our court of appeals do not bind us when we sit as a three-judge district court; plaintiffs suggest that we need only follow decisions of the Supreme Court, the court to which appeal lies. Plaintiffs' Memorandum of Law at 11. The argument draws support from a suggestion, albeit not a flat contention, to that effect advanced by Professor Moore. *See* 1B J. Moore, Moore's Federal Practice ¶ 0.402[1] n. 17 (2d Ed.1983); *see also Confederated Tribes of Colville v. Washington,* 446 F.Supp. 1339, 1356 n. 16 (E.D.Wash.1978) (three-judge court declining to decide the question but adverting to the issue).

Both Professor Moore and *Confederated Tribes* cite the following phrase from *Jehovah's Witnesses in Washington v. King County Hospital,* 278 F.Supp. 488 (W.D.Wash.1967), *aff'd mem.,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968): "In this special three-judge court case we are not bound by any judicial decisions other than those of the United States Supreme Court." 278 F.Supp. at 504–505. The *Jehovah's Witnesses* court, however, used this statement to introduce a discussion of state court precedents on a question of federal law. Further, the state court precedents supported the district court's conclusion. We have found no case support other than *Jehovah's Witnesses* for the proposition that a three-judge court need not follow its court of appeals. In fact, we have found considerable authority to the contrary. *See Finch v. Mississippi State Medical Ass'n, Inc.,* 585 F.2d 765, 773 (5th Cir.1978) ("the three-judge court was required to analyze carefully [a court of appeals decision] because, as a district court within the Second Circuit, it was bound to follow the law of the circuit"); *Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d Cir.1970) (no reason to convene three-judge court when decision of court of appeals in prior case determines issue); *Russell v. Hathaway,* 423 F.Supp. 833, 835 (N.D. Tex.1976) (three-judge court analyzing reasons for following decisions of court of appeals); *Hopson v. Schilling,* 418 F.Supp. 1223, 1234–1235 n. 15 (N.D.Ind.1976) (a three-judge court would be bound by court of appeals opinion on point, so not necessary to convene three-judge panel); *Athanson v. Grasso,* 411 F.Supp. 1153, 1157 (D.Conn.1976) ("As a district court, although composed of three judges, we are required to follow the law of our own circuit insofar as it is pertinent."). For discussion of earlier precedent on the question, see *Alabama NAACP State Conference of Branches v. Wallace,* 269 F.Supp. 346, 350 (M.D.Ala.1967) (three-judge court). We therefore feel ourselves bound not only by pertinent decisions of the Supreme Court, but also by pertinent decisions of the Court of Appeals for the Third Circuit.

931 (3d Cir.1983);[14] *Nguyen v. United States Catholic Conference*, 719 F.2d 52 (3d Cir.1983);[15] *Community Medical Center v. Emergency Medical Services*, 712 F.2d 878 (3d Cir.1983).[16]

*Lugar* has particular relevance to this case. In *Lugar* the Court refined the "close nexus" analysis propounded in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The *Lugar* court divided state-action analysis into two parts:

> First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

457 U.S. at 937, 102 S.Ct. at 2754. We begin our analysis of state action by considering *Lugar*'s first prong. We then move on to the more difficult question whether employers and insurers who invoke section 413's automatic supersedeas "may fairly be said to be ... state actors[s]."

### (1) *State-created right or privilege*

■ An employer or insurer who believes that an employee receiving worker's compensation benefits has completely recovered or has returned to work at the same or higher pay must nevertheless continue to pay compensation benefits unless the employer or insurer qualifies for a supersedeas under section 413. In order to qualify for an automatic supersedeas, the employer or insurer must file a petition with the Bureau of Worker's Compensation (a) accompanied by the affidavit of a doctor averring complete recovery or (b) reciting that the employee has returned to work at a wage at least equalling his prior wage. If an employer or insurer suspends compensation payments without qualifying for this automatic supersedeas and without a referee's adjudication, the employer or in-

**14.** In *Jackson*, plaintiff, after his termination, sued his union and his former employer under section 1983 and under the National Labor Relations Act. Jackson contended that the union had improperly failed to press his grievance to arbitration. The Court of Appeals found no state action in the union's actions. The court accepted the district court's assumption *arguendo* that an action by Temple University constituted state action and proceeded to determine that the University had deprived Jackson of no rights.

In this context we feel it appropriate to point out that one member of this panel has recently held that, because of Temple University's "state related" status (involving substantial state funding and appointment of one-third of the trustees by high state officials), Temple has a "symbiotic relationship" with Pennsylvania sufficient under *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), to make all Temple's actions "state action." *Schier v. Temple University*, Civil Action No. 82–3554 (E.D.Pa. Dec. 8, 1983) (bench opinion per Pollak, J.); *accord Isaacs v. Board of Trustees of Temple University*, 385 F.Supp. 473 (E.D.Pa. 1974). The decisions in *Schier* and *Isaacs* are harmonious with the decision of our Court of Appeals in 1977 that actions of the University of Pittsburgh, another "state related" institution, are "state action." *Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir.1977). But the Court of Appeals will soon reconsider the con-

stitutional status of the University of Pittsburgh, since a district court has recently determined that the Court of Appeals' *Braden* analysis of the University of Pittsburgh's relationship with the Commonwealth has been undercut by the Supreme Court's decisions in *Lugar, Rendell-Baker*, and *Blum. Krynicky v. University of Pittsburgh*, 560 F.Supp. 803 (W.D.Pa.1983), *appeal docketed*, No. 83–5471 (3d Cir.1983). We mention these matters to make clear that the instant opinion, which does not rest on a *Burton* state-action analysis, reflects no view by the members of this court on the problem shortly to be addressed by the Court of Appeals in *Krynicky.*

**15.** *Nguyen* involved a claim that the United States Catholic Conference violated the Fifth Amendment in its distribution of benefits to Indochinese refugees. Although the federal government reimbursed some benefits under the Indochina Migration and Refugee Assistance Act of 1975 through a contractual relationship with the Catholic Conference, the Court of Appeals found no state action.

**16.** In *Community Medical Center* the plaintiff challenged designation of another hospital as the "resource hospital" for the Scranton area. Defendant, a private non-profit corporation, existed to contract with the state and federal governments as a "lead agency" under several grants programs. Nevertheless, the Court of Appeals found no state action under any of several theories.

surer becomes liable for penalties of ten, or even twenty, percent of the withheld payments. Pa.Stat.Ann. tit. 77, § 774.1 (Purdon Supp.1982).

Termination through invocation of the automatic supersedeas provision, then, constitutes "the exercise of some right or privilege created by the state." In that sense, this case resembles *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); in both cases the deprivation requires a special filing process specifically created by the state.

The automatic supersedeas provision does not merely codify the ordinary way of doing things, as the Court characterized section 7–210 of the New York Uniform Commercial Code in *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Section 7–210 allowed a warehouseman to sell goods in his possession to satisfy his lien, remitting the owner of the goods to asserting in a subsequent lawsuit any claim that the warehouseman had no proper lien. The Court rejected a claim that section 7–210 was unconstitutional in authorizing a transfer of the owner's goods to a third person without a hearing. The Court reasoned that the challenged application of section 7–210 involved no state action because, among other things, section 7–210 did not substantially change the state's relation to the transaction.[17] By contrast, absent the automatic supersedeas provision, an employer or insurer could not terminate an individual's benefits without a referee's adjudication. If the employer or insurer did so terminate, the Workmen's Compensation Act would not only award damages, but would also impose penalties.

*(2) State Actor*

Having found that section 413 satisfies *Lugar*'s first prong, we now turn to the second requirement that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." 457 U.S. at 937, 102 S.Ct. at 2754. In analyzing this requirement, we have found it useful to distinguish four sorts of employers and insurers who may invoke the automatic supersedeas provision of section 413.

First, we consider the government as an employer. The Act covers employees of the Commonwealth and of local governmental entities by virtue of Pa.Stat.Ann. tit. 77, § 21 (Purdon 1952), which defines "employer" to include "the Commonwealth, and all governmental agencies created by it." Public employers may choose not to insure against their worker's compensation liability under the Act. For example, counsel represented to us at argument that the Pennsylvania Turnpike Commission self-insures. Tr. of Oral Arg. at 23. Thus, in section III(B)(2)(a) of this opinion, we consider whether self-insuring public employers are state actors.

Most public employers, however, insure through the State Workmen's Insurance Fund ("SWIF"), an insurer administered by the State Workmen's Insurance Board. *See* Pa.Stat.Ann. tit. 77, § 221 (Purdon Supp.1982). Section III(B)(2)(b) of this opinion considers whether SWIF is a state actor when it invokes the automatic supersedeas provision on behalf of a public employer.

Private employers can also insure through SWIF. Section III(B)(2)(c) of this opinion considers whether SWIF is a state actor when it invokes section 413 on behalf of a private employer.

**17.** In our discussion of *Flagg Brothers* here, we have somewhat anachronistically assumed that the *Flagg Brothers* opinion applied *Lugar's* two-pronged state-action analysis. The Court, of course, had not yet expressly formulated this analysis in 1978. Therefore, the *Flagg Brothers* opinion does not expressly hold that the U.C.C. involved no state-created right or privilege. We read the *Flagg Brothers* result as resting on this first prong of the *Lugar* analysis. Because the Court in *Flagg Brothers* did not expressly consider as separate the issues of whether a state-created right or privilege existed and whether the person responsible for the deprivation could fairly be said to be a state actor, one could instead read *Flagg Brothers* as holding that the warehouseman was not a state actor, even though the warehouseman employed a state-created right or privilege. We prefer the first reading.

Finally, section III(B)(2)(d) considers whether a private insurer or a self-insuring private employer is a state actor when it invokes the automatic supersedeas provision.

#### (a) *Self-Insured Public Employers*

State action exists when a self-insured public employer invokes section 413's automatic supersedeas procedure. By inquiring whether a state-created procedure involving a state actor worked a particular deprivation, *Lugar*'s two-pronged test seeks to identify that conduct "fairly attributable to the state." 457 U.S. at 937, 102 S.Ct. at 2754; *accord Rendell-Baker v. Kohn*, 457 U.S. at 838, 102 S.Ct. at 2770; *Blum v. Yaretsky*, 457 U.S. at 1004, 102 S.Ct. at 2786 ("The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct ....."); *Nguyen v. United States Catholic Conference*, 719 F.2d 52, 54 (3d Cir.1983); *Community Medical Center v. Emergency Medical Services*, 712 F.2d 878, 879 (3d Cir.1983). However, the two aspects of the test "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the state to his decisions." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754. Thus, when a state agency or a local government invokes section 413 against one of its employees, the state is the actor.

#### (b) *Public Employers Insured by SWIF*

The analysis becomes slightly more complicated when a public employer insures through SWIF. Under Pennsylvania practice, the insurer, and not the employer, becomes the party responsible for payment of compensation benefits, *see Cease v. Thomas*, 155 Pa.Super. 215, 38 A.2d 547 (1944), and thus the insurer becomes the party which will actually invoke the automatic supersedeas.

At oral argument, counsel for the Commonwealth defendants seemed to concede that when SWIF acted on behalf of a public employer, state action existed. Tr. of Oral

Arg. at 20. We give this concession close consideration because recent precedents cast some doubt on the existence of state action when a government agency "contracts out" its responsibilities. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (education for disturbed students); *Nguyen v. United States Catholic Conference*, 719 F.2d 52 (3d Cir.1983) (payment of relief funds to refugees); *cf. White v. Massachusetts Council of Construction Employers*, —— U.S. ——, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (city which will only hire contractors who themselves hire half their workers from the city does not violate the commerce clause).

The State Workmen's Insurance Fund strongly argues that it is not a state agency and therefore does not have an "official character ... such as to lend the weight of the state to [its] decisions." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2754. We disagree.

SWIF's argument proceeds from the limitation on the state's liability for claims on the fund to the assessments and premiums paid by insured employers. *See* Pa. Stat.Ann. tit. 77, § 221 (Purdon Supp.1982). But that same sentence provides that "[s]uch Fund shall be administered by the [State Workmen's Insurance] Board ....." *Id.* The Board consists of the Commissioner of Labor and Industry, the Insurance Commissioner, and the State Treasurer. Pa.Stat.Ann. tit. 77, § 211 (Purdon 1952). Further,

> [t]he officers and employes of the State Workmen's Insurance Board created by the act to which this is a supplement shall be deemed and held to be, for all purposes whatsoever, officers and employes of the Commonwealth of Pennsylvania, and shall be entitled to and have and exercise all the rights, powers, and privileges, and be subject to all the duties, restrictions, and penalties, of other officers and employes of the Commonwealth.

Pa.Stat.Ann. tit. 77, § 381 (Purdon 1952).

In short, three high state officials, collectively constituting the State Workmen's In-

surance Board, have sole supervision of SWIF's administration. Moreover, these officials and their Board employees are "for all purposes whatsoever, officers and employees of the Commonwealth of Pennsylvania...." They are subject to all the restrictions of other officers and employees of the Commonwealth. These restrictions include the Fourteenth Amendment. Therefore, we find that when SWIF acts, the state acts. *See Pennsylvania v. Board of Trusts*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *Pennsylvania v. Brown*, 392 F.2d 120 (3d Cir.1968), *cert. denied*, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968).

#### (c) *Private Employers Insured by SWIF*

Although counsel for the Commonwealth seems to have drawn a distinction between SWIF acting as insurer for a public employer and SWIF acting as insurer for a private employer, our analysis in the preceding subsection leads to the conclusion that SWIF acts for the state whenever it acts. Accordingly, the force of that argument requires us to find that state action exists when SWIF invokes the automatic supersedeas provision of section 413 even when SWIF does so on behalf of a private employer.

#### (d) *Private Insurers and Self-Insured Private Employers*

We have found state action, then, whenever a public entity insures itself and whenever either a public or private employer uses SWIF to insure. In any of these cases, invocation of the automatic supersedeas by the self-insuring public employer or by the public insurer is "fairly attributable to the state" because the state itself invokes section 413. We cannot base our conclusion on this ground, however, when a private insurer or employer uses section 413.

We note initially that *Silas v. Smith*, 361 F.Supp. 1187 (E.D.Pa.1973), dealt with the private employer/private insurer situation. See our discussion at p. 219, *supra*. The *Silas* court found no state action in a private insurer's invocation of the automatic supersedeas.[18] The Pennsylvania Commonwealth Court was assessing the private employer/private insurer situation when, in reliance on *Silas*, it found the current section 413 constitutionally acceptable. *Henderson v. Workmen's Compensation Appeal Bd. (Rockwell International)*, 69 Pa. Commw. 613, 452 A.2d 277 (1982), *petition for allowance of appeal denied* (Pa. March 8, 1983); *see also Commonwealth Dept. of Labor and Industry v. Workmen's Compensation Appeal Bd.*, 58 Pa.Commw. 413, 416 n. 3, 427 A.2d 1277, 1278 n. 3 (1981) (citing *Silas* for the proposition that notice and a hearing are not required for an automatic supersedeas in a case involving a private insurer). We do not find these precedents dispositive here.[19]

We hold that invocation of section 413's automatic supersedeas provision by a pri-

---

**18.** The *Silas* court also found that the process accorded was in conformity with due process standards. Prior to *Silas* a three-judge court had held Georgia's automatic supersedeas unconstitutional in the private insurer/private employer context. *Davis v. Caldwell*, 53 F.R.D. 373 (N.D.Ga.1971).

**19.** Decisions by Pennsylvania courts on issues of federal law merit our respectful consideration, but they are not controlling precedents.

In analyzing *Silas'* precedential weight, we note that, even if we believed that *Silas* stood on all fours with this case, we could not merely follow *Silas* without further inquiry. In *Farley v. Farley*, 481 F.2d 1009 (3d Cir.1973), the court considered an appeal from a district judge's ruling which had dismissed a complaint without convening a three-judge court on the ground that a decision of a prior three-judge panel in the same district was controlling. The Court of Appeals initially held that the earlier three-judge opinion did not completely determine the question in *Farley*. The Court of Appeals then wrote: "even if *Kaelin* [*v. Warden*, 334 F.Supp. 602 (E.D.Pa.1971)] had decided the precise issue, its holding is not a precedent binding on other courts. The decision of a three-judge court is entitled to no more weight than any other district court decision." 481 F.2d at 1012; *accord San Diego Unified Port District v. Gianturco*, 651 F.2d 1306, 1315 n. 24 (9th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866] (1982); *Mazer v. Weinberger*, 385

vate insurer or by a private employer involves state action. The Supreme Court has "consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Lugar*, 457 U.S. at 941, 102 S.Ct. at 2756. "[I]n this context 'joint participation' [does not require] something more than invoking the aid of state officials to take advantage of state created attachment procedures." 457 U.S. at 942, 102 S.Ct. at 2756.

In order to invoke the automatic supersedeas, an insurer or employer must file a petition on a form provided by the state. A

F.Supp. 1321, 1324 (E.D.Pa.1974) (three-judge court under 28 U.S.C. §§ 2282–2284 declining to follow previous three-judge court's decision), *vacated on other grounds*, 422 U.S. 1050, 95 S.Ct. 2671, 45 L.Ed.2d 704 (1975); *Johnston v. Hodges*, 372 F.Supp. 1015, 1020 (E.D.Ky.1974) (one-judge district court declining to follow previous three-judge court's decision). Thus, while we take *Silas* seriously as persuasive precedent, *Farley* enjoins us to consider the issues in this case anew.

We do not, however, believe that *Silas* does stand on all fours with this case even in our consideration of state action on the part of private insurers. The *Silas* court characterized the worker's compensation arrangement as one of private contract:

> The possessory interest in property emphasized in *Fuentes* [*v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972),] is absent here. What is here involved is a contractual (although sanctioned by statute) claim to benefits which the other party to the contract disputes. As such, this interest is indistinguishable from the interest of the recipient of funds in any commercial situation in which periodic payments are terminated pending resolution of the underlying dispute.

361 F.Supp. at 1192.

In order to characterize a situation as one of ordinary contract, the parties must have some option to change the usual distribution of rights. *See, e.g., Silas*, 361 F.Supp. at 1188 ("Neither the employer nor the employee is bound to accept the provisions of the Workmen's Compensation Act...."). Thus, in the ordinary commercial situation the payor may terminate periodic payments pending resolution of a dispute, but the parties can always decide at the beginning to provide security for the payee so that the payee, and not the payor, in effect holds the funds during a dispute.

Since the decision in *Silas*, Pennsylvania has amended the Workmen's Compensation Act to

state agency, the Bureau of Worker's Compensation, must review the petition before the supersedeas may take effect. Although the Bureau does not review the petition's merits, it does review the petition for formal compliance with the Workmen's Compensation Act; the Bureau has a form for returning inadequate petitions. Unless the insurer or employer satisfies the Bureau of the petition's compliance with section 413, the insurer or employer cannot terminate the employee's benefits. Further, the insurer/employer relies on the Bureau to notify the employee of the termination of benefits.[20]

■ Section 413's automatic supersedeas procedure requires a filing with the Bureau

make it mandatory. Act No. 263, § 5, 1974 Pa.Laws 782, 784 (repealing section 302 of the Act, former Pa.Stat.Ann. tit. 77, §§ 461, 462 (Purdon 1952)). We believe that the change in the coverage of the Act from optional to mandatory attenuates *Silas'* analogy of section 413's automatic supersedeas to the operation of any ordinary commercial contract. The mandatory quality of the Act now makes every aspect of the compensation scheme's operation appear more "public" and less "private."

20. *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), is not at odds with the conclusion that this involvement of the state in an automatic supersedeas petition constitutes "joint participation." *Blum* involved a challenge to a New York statute which permitted a private board of doctors at each nursing home to determine if a Medicare recipient required less intensive care. If the doctors made this determination, the nursing home would transfer the patient to a less care-intensive facility. In finding no state action, the Court took pains to point out that the state never reviewed the transfer decision in any way. While the state received notice of the transfer, the state only decided whether or not to adjust the patient's Medicare benefits. 457 U.S. at 1010, 102 S.Ct. at 2789. *Blum*, then, leaves open the question whether, had New York reviewed the transfer decision, New York would then have been deemed, for Fourteenth Amendment purposes, to be a joint participant in the transfer decision. *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 354–355, 95 S.Ct. 449, 453, 455–456, 42 L.Ed.2d 477 (1974) (specifically distinguishing a termination of electricity service with state approval from a termination initiated according to procedures approved by the state in a general tariff); *Community Medical Center v. Emergency Medical Services*, 712 F.2d at 881 (noting the Supreme Court's distinction between "direct" and "indirect" involvement).

of Worker's Compensation. This filing is sufficient to constitute "joint participation" and to subject private invocation of the automatic supersedeas to the due process clause.[21]

### (C) Due Process

■ Having decided that benefits terminations under section 413's automatic supersedeas provision must comply with the Fourteenth Amendment, we now consider whether section 413 accords plaintiffs sufficient process to constitute due process. *See, e.g., Perri v. Aytch,* 724 F.2d 362 at 366, (3d Cir. Dec. 22, 1983) ("Even though Perri had a property interest in her probationary employment, she must still demonstrate that she was deprived of the interest without due process of law.") We agree with the Supreme Court of Iowa that *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), makes the automatic supersedeas unconstitutional. *See Auxier v. Woodward State Hospital-School,* 266 N.W.2d 139 (Iowa 1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 319, 58 L.Ed.2d 324 (1979) (holding Iowa version of section 413 unconstitutional).[22]

In *Mathews,* the Supreme Court held that the Social Security Administration need not provide an evidentiary hearing before terminating an individual's Social Security Disability Insurance benefits. *Cf. Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (requiring pretermination evidentiary hearing for recipient of AFDC). The Court concluded in *Mathews* that disability insurance recipients threatened with a loss of benefits were accorded a sufficient pretermination process, albeit that process was not of a formal evidentiary nature, so that an evidentiary hearing could be postponed until after termination.

The Social Security procedure provided that

[w]henever the agency's tentative assessment of the beneficiary's condition differs from his own assessment, the beneficiary is informed that benefits may be terminated, provided a summary of the evidence upon which the proposed determination to terminate is based, and afforded an opportunity to review the medical reports and other evidence in his

---

**21.** In this section we have concluded that we can fairly attribute to the state an invocation of section 413's automatic supersedeas. We have based this conclusion upon section 413's requirement that an employer or insurer file a petition with the Bureau of Workmen's Compensation which the Bureau checks for formal compliance with the Act and the Bureau's regulations, and which the Bureau sends to the terminated employee. We think these ingredients of formal and systemic participation by state personnel stamp the termination of benefits as the state action for which the state is accountable, within the intendment of the Fourteenth Amendment, under the controlling decisions of the Supreme Court.

We acknowledge, however, some sense of unease about applying a mode of legal analysis which, as Judge Sloviter has cogently phrased it, "hinges a finding of state action on what appears to be the somewhat superficial factor of involvement by a state official rather than on a more reasoned approach which takes into account state interests and state policy ...." *Chrysler Corp. v. Fedders Corp.,* 670 F.2d 1316, 1327 (3d Cir.1982). Such a "more reasoned approach" would very likely ask the question whether the statutorily defined system of work-

er's compensation is in its fundamental social and economic implication more akin to a contractual undertaking of employer and employee than it is to a disability insurance system established by the state as part of its welfare network. That would seem a more nourishing question than the somewhat wooden "state action" logomachy which the Court's jurisprudence has required judges to pursue for a full one hundred years. *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

To recognize that the prescribed analysis is a wooden one—and, moreover, one which is by no means easy, *Community Medical Center v. Emergency Medical Services,* 712 F.2d at 879 n. 4—is not to indict it. The lines within which conventional "state action" analysis has been channeled by the Supreme Court have the advantage of being susceptible of relatively systematic application from case to case.

Nonetheless, we comfort ourselves in this case with the feeling that if the alternative approach adumbrated by Judge Sloviter could be rigorously pursued, it would yield the same answer that we have arrived at by a more conventional path.

**22.** We note that the *Silas* court did not have the benefit of *Mathews'* teachings.

case file. He may also respond in writing and submit additional evidence. 424 U.S. at 337–338, 96 S.Ct. at 904 (footnote omitted); *see also Washington v. Secretary of Health and Human Services,* 718 F.2d 608, 609–610 (3d Cir.1983) (describing waiver of these procedural protections). The procedures sustained in *Mathews* were perceived by the Court as "provid[ing] the claimant with an effective process for asserting his claim prior to any administrative action ...." 424 U.S. at 349, 96 S.Ct. at 909–910. In marked contrast, section 413 provides no notice whatsoever until *after* the termination of benefits pending a final hearing.[23]

#### IV.

The foregoing discussion has led us to the conclusion that operation of the automatic supersedeas authorized by section 413 of the Pennsylvania Workmen's Compensation Act involves conduct reasonably attributable to the state and that section 413 does not accord worker's compensation recipients due process. Thus, plaintiffs have made out a violation of 42 U.S.C. § 1983 (Supp. V 1981). Plaintiffs are entitled to entry of a judgment declaring the unconstitutionality of the automatic supersedeas provision of section 413.

■ Invalidation of the automatic supersedeas provision does not call for invalidation of any other provision of the Workmen's Compensation Act, even though the Act contains no severability provision. "Under Pennsylvania law, separate provisions of a statute are presumed severable, and any particular one will survive a decision voiding another unless it is so interrelated with the void provision or incomplete without it that the legislature could not have intended it to stand alone." *Stoner v. Presbyterian Hospital,* 609 F.2d 109, 112 (3d Cir.1979) (citing 1 Pa.Cons.Stat.Ann. § 1925).[24]

ADAMS, Circuit Judge, concurring.

For nearly two decades, federal courts have endeavored to define the contours of due process rights applicable to state and federal entitlement programs. Today, this court turns its attention to the procedural constraints that due process places upon the Pennsylvania system of workmen's compensation terminations.

In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969), the Supreme Court made it clear that the creation of a state entitlement program vests its recipients with due process protection against arbitrary termination of benefits. While *Goldberg* mandated an evidentiary hearing prior to termination of benefits under the Aid to Families with Dependent Children (AFDC) program, its emphasis upon the destitution of AFDC recipients left open the possibility that due process could be satisfied by less than a pre-termination evidentiary proceeding for the bene-

---

**23.** The *Mathews* court also noted several other procedural protections primarily involving substantive agency review of a file before termination. 424 U.S. at 337, 96 S.Ct. at 904. While we view the absence of similar provisions here as incrementally compounding the procedural frailty of the system, what is from a due process perspective the fatal flaw in section 413 is the lack of notice and of an opportunity to submit any evidence or argument before termination.

**24.** A different perspective on separability would come into play if, on appeal, our holding that every invocation of section 413 involves state action is found to be too sweeping. In section III(B)(2) of this opinion we determined that, from the perspective of the Fourteenth Amendment and section 1983, the temporary termination of benefits was a deprivation fairly attributable to the state whether the automatic supersedeas was utilized by a self-insuring government

agency, by SWIF on behalf of a governmental or a private employer, or by a private insurer/employer. Assuming *arguendo* we were wrong in viewing a private insurer/employer's utilization of the automatic supersedeas procedure as state action, the question would arise whether the automatic supersedeas should be held valid in that aspect and invalid in the other aspects, or should be held invalid in its entirety. We think it highly unlikely that the Legislature would differentiate between the procedural entitlements of employees on the basis of their employer or their employer's choice of insurer merely because the Constitution permitted this distinction. Accordingly, we would conclude that if the automatic supersedeas provision is invalid as to any class of employers or insurers, the automatic supersedeas must be stricken in its entirety.

ficiaries of other entitlement programs. Subsequently, in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court held that certain termination proceedings for Social Security disability benefits could be discontinued despite the absence of an evidentiary hearing and not violate due process so long as the termination procedures were sufficiently reliable. Because workers' compensation is manifestly more comparable to the disability benefits involved in *Mathews* than the more protected AFDC benefits in *Goldberg*, I believe that further elaboration of the due process question presented in this case is in order.

### I.

Recipients of statutorily created benefits have a property interest in the continued receipt of those benefits. *Board of Regents v. Roth*, 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972); *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); *Goldberg, supra*, 397 U.S. at 261–62, 90 S.Ct. at 1016–17. The existence of this constitutionally protected property interest was not disputed in *Mathews*, where the Court noted,

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment....
>
> The Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest.... The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."

424 U.S. at 332–33, 96 S.Ct. at 901–902 (citations omitted).

Taking the lead from *Mathews*, this Court must determine whether the Pennsylvania supersedeas provision offers recipients of workmen's compensation payments a "meaningful time" and "meaningful manner" to challenge terminations of such payments within the scope of due process. This determination must be made in the context of the specific "time, place and circumstances" of the challenged state procedure. *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Thus under *Mathews* a reviewing court is compelled to balance the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administration burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903.

My concern in the present case is with the second of the enumerated *Mathews* factors: whether the supersedeas termination procedure is sufficiently reliable to protect against erroneous termination. As the majority opinion makes clear, the challenged Pennsylvania statute offers the terminated compensation recipient only post-facto restoration of benefits. While the statute does allow for interest on the unpaid amounts found to be due as well as attorneys' fees in case of wrongful termination, a principal question in this proceeding, as I see it, is whether such an arrangement offers sufficient indicia of reliability to satisfy constitutional due process requirements.

### II.

In *Mathews* the Supreme Court weighed the specific needs of the recipient class and the prescribed termination procedures that allow for the cessation of benefits without a full evidentiary hearing. The Court found that the potential injury to a discontinued recipient was the same as in *Goldberg*: the interrupted receipt of income pending final administrative review of the

termination decision. Two critical factors distinguished the affected class in *Mathews* from that in *Goldberg*. First, as in the present case, disability recipients are not as destitute as AFDC recipients and therefore the "potential deprivation here is likely to be less than in *Goldberg....*" 424 U.S. 341, 96 S.Ct. at 906.[1] Second, *Mathews* focused on "the fairness and reliability of the existing pre-termination procedures, and the probable value, if any, of additional procedural safeguards." 424 U.S. at 343, 96 S.Ct. at 907. *Mathews* identified eight features of the social security disability statute that provided sufficient evidence of fairness and reliability:

1. Termination follows continuing eligibility monitoring by a physician and non-medical administrator;

2. There is periodic communication between the two monitors and the disability recipient;

3. In case of conflict between the monitors and the disability recipient, the recipient is examined prior to termination by an independent physician;

4. The recipient is provided immediate notice of agency intent to terminate benefits;

5. The recipient and/or his/her representative is allowed full access to all information relied upon by the state agency prior to termination and is allowed to respond in writing and submit additional evidence;

6. The state agency determinations are not final until reviewed by an examiner in the Social Security Administration's Bureau of Disability Insurance;

7. Benefits are terminated two months after the date when disability is found to have ceased in order to minimize economic shock;

8. Final determination is premised on technical, medical evaluation which does not require adversarial process beyond the submission of affidavits and documentary evidence.

424 U.S. at 337–38, 96 S.Ct. at 904. The Pennsylvania supersedeas termination procedure therefore must be scrutinized in light of these features to determine whether it comports with the due process requirements of the Constitution.

### III.

Judged against the procedures approved by the Supreme Court in *Mathews*, the Pennsylvania supersedeas statute has two grave faults. First, the statute imposes no requirement of notice to the employee prior to termination. Under 77 Penna.Stat.Ann. § 774 (Purdon 1982), the filing of a supersedeas petition, accompanied by an affidavit of a physician declaring that the claimant has recovered, suspends compensation benefits to the extent that such benefits would cease if all the allegations contained in the petition were true; the challenged statute makes no mention of pre-termination notice. According to the deposition testimony of Workers' Compensation Referee Irvin Stander, medical examination reports and other documentary materials are not generally made available to the claimant until after termination and, on occasion, not until the actual post-termination hearing. Exhibit 61, at 7–12. Referee Stander acknowledged that he was aware of hearings at which "the claimant has never seen the report, he doesn't know what the report says, and he doesn't know what evaluation has been made of his disability ...." *Id.* at 12.

The failure to give notice distinguishes the supersedeas provision from the Penn-

---

**1.** In *Goldberg* the Court emphasized:
The crucial factor in this context—a factor not present in the case of ... virtually anyone else whose governmental entitlements are ended— is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits.

397 U.S. at 264, 90 S.Ct. at 1018. *Mathews* found this exigency created by poverty not to apply to disability recipients, "although the degree of difference can be overstated." 424 U.S. at 341, 96 S.Ct. at 906.

sylvania non-evidentiary hearing termination procedure for unemployment benefits upheld in *Ross v. Horn*, 598 F.2d 1312 (3d Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). *See also, Wilkinson v. Abrams*, 627 F.2d 650 (3d Cir.1980); *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir.1978) (due process not violated by New York disability retirement benefits termination procedure because it gave notice to the claimant and allowed him or her to present evidence challenging the termination). Moreover, as the majority opinion notes, the Supreme Court of Iowa struck down a state summary termination procedure similar to the challenged Pennsylvania statute for this precise failure to provide pre-termination notice. *Auxier v. Woodward State Hospital-School*, 266 N.W.2d 139 (Iowa 1978), *cert. denied*, 439 U.S. 930, 99 S.Ct. 319, 58 L.Ed.2d 324 (1979). Relying on *Mathews*, the court in *Auxier* held:

> [D]ue process demands that, prior to termination of workers compensation benefits, except where the claimant has demonstrated recovery by returning to work, he or she is entitled to a notice which, as a minimum, requires the following:
>
> (1) the contemplated termination,
>
> (2) that the termination of benefits was to occur at a specified time not less than 30 days after notice,
>
> (3) the reason or reasons for the termination,
>
> (4) that the recipient had the opportunity to submit any evidence of documents disputing or contradicting the reasons given for termination, and, if such evidence or documents are submitted, to be advised whether termination is still contemplated,
>
> (5) that the recipient had the right to petition for review....

*Id.* at 142–43. Similarly, the West Virginia Supreme Court of Appeals held that a state workmen's compensation termination must be preceded by written notice, an opportunity for the claimant to furnish relevant countervailing information, and an opportunity under the applicable state statute to an evidentiary hearing upon timely protest to an adverse order. *Mitchell v. State Workmen's Compensation Comm'r*, 256 S.E.2d 1, 11–13 (W.Va.1979). *See also Carr v. SAIF Corp.*, 65 Or.App. 110, 670 P.2d 1037, 1046 (C.A.1983) (in banc) (Oregon workers' compensation termination requires preliminary notice of proposed cessation and of the evidence upon which termination is premised, as well as an opportunity to respond); *Steele v. North Dakota Workmen's Comp. Bureau*, 273 N.W.2d 692, 700–701 & n. 4 (S.Ct.N.D.1978), (reliance on *Mathews* and *Goldberg* to require notice, additional reliance on state law to require formal hearing if any material fact is disputed). *Cf. Laird v. Workers' Compensation Bd.*, 147 Cal.App.3d 198, 195 Cal.Rptr. 44 (1983) (termination requires preliminary hearing).[2]

The second deficiency in the Pennsylvania arrangement is that it provides no independent check by state authorities on the termination certification by a physician. Thus a physician employed by an insurance carrier, to whom a disabled worker must periodically report, may at any point certify that the disability has ceased. As noted above, that certification alone immediately terminates benefits under the supersedeas provision. Although *Mathews* does not require a full evidentiary hearing, the Supreme Court has nevertheless observed, "[o]rdinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Memphis Light Gas & Water Div. v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978). *See generally*, Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267 (1975). We need not set forth the precise minimum safeguards that would protect a termination not accom-

---

**2.** Other state systems which avoid the due process problems present in no-notice procedure include those of Washington, *see Herron v. McClanahan*, 28 Wash.App. 552, 625 P.2d 707 (1981) (presentation of documentary and deposition evidence to a jury), Florida *see Wellcraft*

*Marine Corp. v. Turner*, 435 So.2d 864, 865 (Fla. App. 3 Dist.1983) (employer/carrier has burden of proof in any contested disability termination proceeding), and Maine, *see Merrifield v. Hannaford Bros. Co.*, 409 A.2d 1313 (S.Ct.Me.1980) (same).

panied by an evidentiary hearing. However, it bears comment that the technical, medical testimony that insured reliability in *Mathews* was followed by two tiers of independent state and federal agency review prior to termination of benefits. In short, the use of the unchecked recommendation of a physician in the employ of an interested party to terminate a benefit in which a recipient has a cognizable property interest is at odds with the due process concepts set forth in *Mathews* and *Goldberg*.

## IV.

Because the Pennsylvania supersedeas proceeding affords the affected party no notice and because it fails to provide a mechanism for insuring the relative reliability of its termination proceedings, the challenged Pennsylvania statute must fall. The centrality of the notice defect and the insufficient guarantee of decisionmaker impartiality requires this Court to hold that prospect of future settlement of the claim, even with the payment of interest and an attorneys' fee, does not satisfy the constitutional requirements of due process. Accordingly, I join in the result reached by the majority.

Judges GREEN and POLLAK have authorized me to say that they join in this statement.